**MIRAVALLE SUPPLY CO., Inc. v. EL CAMPO RICE MILLING CO.**

No. 14003.

United States Court of Appeals Eighth Circuit.

April 24, 1950.

As Corrected May 6, 1950.

Rehearing Denied May 9, 1950.

680

Walter H. Pollman, St. Louis, Mo. (Charles A. Neumann, St. Louis, Mo., on the brief), for appellant.

Joseph L. Badaracco, St. Louis, Mo. (John S. Leahy and Roberts P. Elam, St. Louis, Mo., on the brief), for appellee.

Before SANBORN, WOODROUGH and THOMAS, Circuit Judges.

THOMAS, Circuit Judge.

The El Campo Rice Milling Company, a Texas corporation of the city of El Campo, Texas, hereinafter called plaintiff, sued the Miravalle Supply Company, Inc., a Missouri corporation of the city of St. Louis, Missouri, hereinafter called defendant, demanding judgment for $11,958.15 for rice admittedly sold the defendant on account on April 5, 1947, and for interest and costs. The defendant admitted the amount of the claim subject to right of set-offs for five counterclaims: (1) for $560; (2) for $2,640; (3) for $805; (4) for $2,223.07;

and (5) for $1,210.37, or a total of $7,438.44, with interest.

The case was tried to the court without a jury. The court found for defendant on its first counterclaim for $560 and interest, denied recovery on the other four counterclaims, and entered judgment for plaintiff on October 18, 1948, for a balance of $12,435.89 including interest, and for costs. Defendant appeals.

Plaintiff's cause of action and defendant's counterclaims all grow out of the performance of a contract entered into between the parties as of October 5, 1946, by the terms of which plaintiff sold to defendant 22,000 pockets of rice. The contract prepared by plaintiff at its home office in El Campo, Texas, was accepted by defendant at St. Louis, Missouri, on October 16, 1946.

A rice millers' regular printed form of contract was used which recited that "the buyer [Miravalle Supply Company] has purchased from the seller [El Campo Milling Company] certain commodities in the amount of, and for the price and under the terms and conditions hereinafter set forth, to wit:". The blank spaces of the printed contract under the designated headings were filled in by plaintiff on the typewriter and are set out in italics as follows:

"Quantity *22,000 pockets*

"Description *96% Whole Grain Texas Patna to grade average season's quality of the rice that we pack in cartons.*

"Price *ceiling price at time of shipment fob El Campo*

"Time of Shipment *2,000 pkts. October, 1946, 5,000 pkts. each November, December, 1946 January, February, 1947*

"*Shipping instructions to be furnished by buyer.*"

Then followed the other terms of the contract in print:

"(1) Shipping Instructions: The buyer agrees to furnish in writing complete shipping instructions to the seller at least five full business days before the date each shipment is required to be made. In the event that the buyer should not furnish instructions, the seller may then, at his option, and

upon notifying the buyer, cancel this agreement, or sell the merchandise for the account of the buyer, or extend the time of shipment on terms mutually agreed upon in writing.

"(2) Routing: Seller shall recognize delivering transportation line when requested by buyer, but all other routing shall be at the option of the seller.

"(3) Separability: This agreement is separable; any breach, waiver, or change as to any lot or partial delivery herein stipulated, shall not alter the obligations of the parties as to any other lot, portion or partial delivery herein agreed upon.

"(4) Delivery: The buyer agrees that in every case, delivery to the transportation company shall constitute delivery to him, and in the event that the buyer shall require that the goods be shipped to his order and/or freight prepaid or allowed, he especially agrees that after delivery of the goods to the carrier, the seller shall be acting for his account and accommodation.

"(5) Liability: The seller shall not be liable for damages arising from his failure to make delivery caused by fire, flood, strikes, riots, car shortage, embargoes on freight, postponement or suspension in sailing of steamers, loss of merchandise in transit, Acts of God, or any circumstances or accident beyond his control.

"(6) Marine Insurance: Seller is authorized to take out the necessary marine insurance for an amount ten per cent in excess of the invoice value, and buyer agrees to pay at current rates said expense in addition to and at the time of payment of contract price.

"(7) Examination: Buyer shall have the right to examine the goods upon arrival and within three business days after such arrival he must give notice to the seller by telegraph, confirmed by mail, any claim for damages on account of condition, quality or grade, and specify the basis of his claim in detail. Failure of the buyer to comply with these rules shall constitute irrevocable acceptance of the goods and bind him to pay the price thereof.

"(8) Terms of Payment: Draft with order notify Bill of Lading attached, seller's order notify buyer. One per cent discount to be allowed for payment of draft within ten days of its date, otherwise net cash."

The word "Patna" is the trade name of a quality or type of rice. A "pocket" of rice weighs 100 pounds, a "bale" 60 pounds and a "case" 50 pounds, "packed in cartons."

During all of the time involved in the controversy the "ceiling price" at which rice could be sold at wholesale was prescribed by the federal Office of Price Administration (OPA).

Before November 18, 1946, the ceiling price of Texas Patna Milled Rice was $9.90 per hundred pounds; after November 18, 1946, it was $10.60. Before November 18, 1946, the ceiling price of Early Prolific Milled Rice was $7.80 per hundred pounds and thereafter $8.65 per hundred pounds.

At all times material to the controversy the price of containers was as follows: Per 100 pounds in Kraft bags containing 3 pounds of rice each, $0.90; per 100 pounds in bags containing 1 pound of rice each, $1.50.

As indicated above, defendant's first counterclaim for $560 was sustained by the court. Since no appeal was taken therefrom it is not in controversy here.

Defendant's second counterclaim for $2,640 is for alleged overcharges for rice shipped as follows:

November 25, 1946, invoice $1,134.00
November 29, 1946, " 567.00
November 30, 1946, " 680.00
December 3, 1946, " 259.00
(370 pockets only considered)

Total, $2,640.00

The controversy involves only the proper interpretation of the contract. The facts are not in dispute. On October 26, 1946, defendant sent to plaintiff the following telegram:

"El Campo Milling Co.

"Ship 5000 Patna in Pockets Against Contract between November 1st and November 7th Stop Acknowledge This Instruction. Please Have Sold This Lot.

"Miravalle Supply Co."

The contract, it will be observed called for shipment of 2,000 pockets of rice in October, 1946, and 5,000 pockets each in November and December, 1946, and in January and February, 1947. 1,800 pockets only had been shipped in October, 1946, leaving 200 pockets of the quota for that month which added to the November quota made a total of 5,200 pockets for shipment in November. The seller did not ship the rice according to the shipping instructions contained in the telegram of October 26, 1946, but made the shipments on which overcharges are claimed in November and December, 1946, as shown above. The OPA ceiling price rose on November 18, 1946, from $9.90 per pocket to $10.60 per pocket, and all shipments made after November 18th were billed at the ceiling price in effect on the date of shipment, resulting in the alleged overcharge claimed. The shipments were made in accordance with paragraph (8) of the contract, that is, with "Draft with order notify Bill of Lading attached", and were paid by defendant under protest. It is defendant's contention that the contract means that shipments in November should have been made promptly five days after shipping instructions were furnished to plaintiff.

The court found that each shipment or delivery of rice by the seller to the purchaser under the contract constituted a separate purchase and that the invoice prices charged on each and all shipments after November 18, 1946, were at the OPA ceiling prices at the time of shipment and delivery. And the court held in Conclusion of Law paragraph 4: "Clause (1) of the printed contract form is a clause inserted for the protection of the seller and does not contemplate a limitation on the delivery specified in the typewritten portions of said contract, and there is no obligation on the seller to make shipments other than as set out in the typewritten portions of said contract."

■ Thus it is clear that only a question of law is involved in the counterclaim of defendant now under consideration, namely, the proper construction of the contract. The parties agree that the contract and its execution are governed by Missouri law. The question of law is whether the court erred in holding that clause (1) of the printed portion of the contract is solely for the protection of the seller with no obligation to make shipments other than as set out in the typewritten portion of the contract.

■ The elementary rules governing the interpretation of written contracts in the Missouri courts do not differ substantially from the rules applied in other courts. The object of construction generally is to determine the intention of the parties to the contract in question. In Missouri the rule is that a contract must be construed so as to give effect to the intention of the parties as collected from the whole instrument, if possible, and conflicting provisions must be reconciled if reconciliation can be effected by any reasonable interpretation. Mathews v. Modern Woodmen, 236 Mo. 326, 342, 139 S.W. 151, Ann.Cas. 1912D, 483; South St. Joseph Live Stock Exchange v. St. Joseph Stock Yards Bank, 223 Mo.App. 623, 224 Mo.App. 40; 16 S.W.2d 722; Carpenter v. Continental Casualty Co., 8 Cir., 95 F.2d 634, 639.

■ Another rule is that where a contract is partly written or typewritten and partly printed and there is a clear conflict between the printed part and the written or typewritten part, the writing will prevail. But the apparently conflicting parts must be reconciled, if possible. School Dist. No. 18 v. McClure, Mo.Sup., 224 S.W. 831, 833.

■ A further rule is that if a written contract is ambiguous, or open to different constructions, then it must be construed most strongly against the party who prepared it and delivered it to the other party to accept and sign. John Deere Plow Co. v. Cooper et al., 230 Mo.App. 167, 91 S.W.2d 145, 148; Sanders v. Sheets, Mo.App., 287 S.W. 1069; Gulf Refining Co. v. Home Indemnity Co. of New York, 8 Cir., 78 F.2d 842, 844.

■ We see no real conflict between the typewritten clause reading "Shipping instructions to be furnished by buyer" and the printed provision that "The buyer agrees

to furnish in writing complete shipping instructions to the seller at least five full business days before the shipment is required to be made." Unless the printed clause considered with the typewritten clause means that the buyer must furnish written shipping instructions in each month five days before the date each shipment is *required* to be made, then the clauses are ambiguous and must be construed most strongly against the seller who prepared the contract and sent it to the buyer to accept and return. Applying the rule requiring reconciliation, however, it seems perfectly clear that the printed clause not only protects the seller by giving it five clear days in which to make shipments after receiving the buyer's instructions but imposes upon it a corresponding obligation to make such shipments promptly as required by the buyer's instructions after the expiration of the five day period. Had the seller in this instance made the required shipments any time before November 18th the invoices would have been based upon the lower ceiling price then existing.

For these reasons defendant's second counterclaim should have been allowed in the amount of $2,640 with interest from November 8, 1946.

Defendant's third counterclaim was for $805 for alleged unauthorized fumigation charges on eight shipments of rice on and between October 18, 1946, and December 30, 1946, inclusive. Upon receipt of the invoice for the shipment October 18, 1946, defendant wrote to plaintiff saying: " * * fumigation charge was unauthorized by us * * * Since our shipments are going directly into consuming channels fumigation is unnecessary, therefore, kindly do not render this special service on future shipments unless we so request." Plaintiff's reply admits the charges and "alleges that the fumigation was essential to prevent infestation and deterioration of the shipments" and that the charges were "fair and reasonable."

At the trial R. H. Hancock, president of plaintiff corporation, testified that defendant's letter, referred to supra, was received, but that "fumigation was necessary to pre-

vent infestation * * *, and in order to comply with the Pure Food Laws."

No provision of the contract required fumigation service, and no law requiring it is cited or quoted in plaintiff's brief. There is no evidence of any facts showing the necessity of such service making the defendant liable under the contract to pay therefor. It appears, however, that the Second Revised Maximum Regulation issued by the OPA on December 5, 1945, was in effect at the time the charges for fumigation complained of were made. Sections 3 and 4 of the Regulation read:

"Sec. 3. *Evasion*. The price limitations set forth in this regulation shall not be evaded whether by direct or indirect methods, in connection with any offer, solicitation, agreement, sale, delivery, purchase, or receipt of or relating to finished rice or rice milling by-products, alone or in conjunction with * * * *service* * * * or other privilege * * * or by any other means. (Emphasis supplied.)

"Sec. 4. *Enforcement*. Persons violating any provision of this regulation are subject to the license revocation or suspension provisions, civil enforcement actions, suits for damages, and criminal penalties, as provided in the Emergency Price Control Act of 1942, as amended. [50 U.S.C.A. Appendix, § 901 et seq.]."

■■ The contract did not provide for added charges for services, and it was unlawful under the regulation to add such charges. The OPA regulations had the force and effect of law. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834; Northwestern Public Service Co. v. Montana-Dakota Utilities Co., 8 Cir., 181 F.2d 19.

The court, therefore, erred in denying defendant's third counterclaim for $805; and the judgment in this respect is reversed.

Defendant's fourth counterclaim is for $2,223.07 alleged to be due with interest because plaintiff required payments for each shipment of rice, aggregating the amount claimed to be due, without deduction for discount pursuant to clause (8) of the contract, which provided: "One per cent discount to be allowed for payment of draft

within ten days of its date, otherwise net cash." It is shown that the payments were made within the ten-day period.

Plaintiff's reply is that the written contract fixes the price of the rice at the OPA ceiling price "at the time of shipment"; that the printed form of contract was printed for use in the rice industry "many years before the * * * Office of Price Administration came into existence" and that after ceiling prices came into existence "it was the uniform custom of the industry and the persons engaged therein (including plaintiff and defendant herein) to neither ask, accept or receive any discount below the ceiling price * * * in the purchase of rice."

Plaintiff's testimony was that the purchase and sale constitute the only transaction plaintiff ever had with defendant and that defendant never made demand for discount until after this controversy arose.

Defendant's testimony was that the transactions between the parties spanned a period of only about six months and that the duty of paying the drafts due under the contract had been delegated to defendant's bookkeeper, and the bookkeeper testified that he had received no instructions to deduct the one per cent discount and that he had no knowledge of the provisions of the contract. The invoices, copies of which are in the record, show no allowance for discounts.

■ Neither waiver nor estoppel are pleaded, and there is no evidence to the effect that defendant at any time acquiesced in the alleged custom of neither asking nor accepting discounts. It is true that under the OPA statute and regulations it was unlawful to receive more than the prescribed ceiling price, but legitimate sales could be made "below ceiling prices", and, therefore, deductions as discounts for prompt payment were lawful. United States v. Commodities Trading Corporation, 1950, 339 U.S. 121, 70 S.Ct. 547.

■ Plaintiff does not expressly contend that defendant waived the contract provision for discounts, though the gist of its argument is based upon that theory. There is no basis in the pleadings or in the evidence, however, to support waiver. Defendant had a legal right to discounts under the contract; and "A waiver is an intentional relinquishment of a known right. To make out a case of implied waiver of a legal right, there must be a clear, unequivocal, and decisive act of a party showing such purpose, or acts amounting to an estoppel on his part." Chappee v. Lubrite Refining Co., 337 Mo. 791, 85 S.W.2d 1034, 1037, 101 A.L.R. 471, and cases cited. And "where substantial rights are involved * * * a waiver must be supported by a consideration to be valid." Mitchell v. American Mut. Ass'n, 226 Mo.App. 696, 46 S.W.2d 231, 237, and cases cited. It cannot be said that the rights involved here are not substantial, and no "clear, intentional relinquishment" of its legal contractual right to the discount of one per cent for prompt payments of the invoices of every shipment of rice. No evidence supports the denial of defendant's counterclaim for one per cent discount as claimed in the pleadings. The judgment dismissing defendant's fourth counterclaim must be, and therefore, is reversed.

■ Defendant's fifth counterclaim is for $1,210.37 for cases and cartons alleged to have been sold to plaintiff at its request in the year 1947. In its reply plaintiff denied that it bought or received the cases and cartons referred to in the counterclaim.

The court's finding of fact on this issue reads: "7. On April 5, 1947, in order to complete delivery of the entire 2,200,000 pounds of rice (the weight equivalent of 22,000 pockets) plaintiff purchased from the Texas West Indies Rice Company; and paid Texas West Indies Rice Company for, 3,101 cases, each containing thirty one pound cartons of Prolific Rice, and 200 bags, each containing 100 pounds, of Patna Rice, and delivered the same to defendant at the place of business of the Texas West Indies Rice Company. Such rice, such containers of it, and such purchase thereof by plaintiff from Texas West Indies Rice Company for delivery by plaintiff to defendant, were all agreed to by defendant prior to the acquisition of the same by plaintiff from the Texas West Indies Rice Company. The cases and cartons in which said rice was packed had been, prior to the purchase thereof by plaintiff, voluntarily and not at the instance of

plaintiff, furnished by defendant to the Texas West Indies Rice Company. Neither the plaintiff, nor any of its officers or stockholders, had any interest in the Texas West Indies Rice Company. The plaintiff's invoice for this delivery of rice, made by plaintiff to. defendant on April 5, 1947, totaled Eleven Thousand Nine Hundred Fifty Eight Dollars and Fifteen Cents ($11,958.15), and neither this invoice nor any part thereof was paid by defendant."

And the Court's Conclusion of Law reads: "6. Defendant's claim in the amount of One Thousand Two Hundred Ten Dollars and Thirty Seven Cents ($1,210.37) for cases and cartons is not chargeable to plaintiff, and if any right exists in plaintiff [defendant] to recover therefor, the same is against Texas West Indies Rice Company, which is not a party to this suit."

On this issue R. H. Hancock, an officer of the Milling Company testified that "the Texas-West Indies Company occasionally furnishes rice for the account of the El Campo Milling Company, and, when it does so, charges the El Campo Milling Company for such rice. On the delivery of rice to the defendant for the account of plaintiff on April 5, 1947, the Texas-West Indies Company actually furnished the rice. This same situation existed on the delivery of rice to defendant for the account of plaintiff on January 4, 1947. "A part of the rice delivered on April 5, 1947, to the defendant was packed in cases and cartons * * * It is my information that those cases and cartons were furnished by the defendant to the Texas-West Indies Company. There was no agreement between plaintiff and defendant regarding defendant's furnishing of these containers."

Louis Miravalle, an officer of the defendant Supply Company, testified that cartons and cases of the value of $1,210.37 were furnished to the Texas-West Indies Company by agreement with plaintiff in order to facilitate the delivery of rice to defendant; that the Texas-West Indies Company was under the charge of the son of R. H. Hancock, president of plaintiff Milling Company; that on January 4, 1947, under simi-

lar circumstances cartons furnished by defendant to the Texas-West Indies Company had been credited to defendant's account by plaintiff, and that relying on that transaction defendant had furnished the cases and cartons in question for the shipment of April 5, 1947.

It appears that the invoice of the Texas-West Indies Company of April 5, 1947, was sent to defendant for the shipment in question, and defendant returned it to the Milling Company on March 31, 1947, saying:

"We are returning herewith invoice of the Texas-West Indies Company and request that since this rice is a delivery against and also terminates the El Campo contract it be billed by El Campo Rice Milling Company the same as was done on a lot covered by your invoice No. 9907 [of January 4, 1947].

"In preparing the invoice allow credit for cartons and cases on the same basis shown on invoice No. 9907 * * *

"Settlement will be made upon receipt of proper invoice."

Instead of complying with the request for credit an invoice for the shipment without deduction for cases and cartons was returned to defendant amounting to $11,958.15.

On April 8, 1947, defendant sent a "Statement of Overcharges" to plaintiff calling attention to the particular overcharge for cartons and cases furnished by defendant in the amount of $1,210.37. Defendant refused to pay plaintiff's claim, and this final invoice of $11,958.15 is the basis of the Milling Company's cause of action in this suit.

It will be observed in connection with this charge against the Supply Company for cases and cartons furnished by it that the president of the Milling Company testified that he knew that the Supply Company furnished the cases and cartons to the Texas-West Indies Company. He did not testify that plaintiff ever paid the Texas-West Indies Company for them. The only evidence which we find in the record sustaining the court's finding that such payment was made is in an unverified answer signed by counsel for plaintiff in July, 1948, to an

interrogatory propounded by defendant; and the statement that payment had been so made was voluntary and not responsive to the interrogatory.

It is difficult to understand why a business firm in a transaction such as the one involved in the contract in this case covering a sale of more than $200,000 worth of rice can demand and insist that defendant pay for containers which it furnished. Before preparing its invoice for the rice delivered for its account by the Texas-West Indies Company plaintiff had received defendant's letter, supra, and, as its president testified, plaintiff knew that defendant had furnished the containers, and it, therefore, knew the amount of the credit to which defendant was entitled. Further, defendant did not purchase the rice from the Texas-West Indies Company but from plaintiff under the contract of October 5, 1946. For the court to hold under these circumstances that plaintiff is entitled to collect from defendant the value of defendant's containers would be to countenance palpable injustice.

The judgment appealed from is reversed with instructions to enter judgment for the plaintiff for $11,958.15 less $7,438.44 (the sum of the defendant's counterclaims allowed as setoffs, that is for $4,519.71. No interest will be allowed for the reason that it appears that the defendant on April 8, 1947, tendered to plaintiff the sum of $6,742.78, which is in excess of the amount found to be due after deducting defendant's established counterclaims or offsets.