**DIPLOMAT HOMES, INC.,**
**Plaintiff,**

v.

**COMMERCIAL STANDARD INSUR-**
**ANCE CO., Defendant.**

**No. 2304.**

United States District Court,
W. D. Missouri,
Southwestern Division.

May 15, 1975.

Karl W. Blanchard, Jr., Blanchard, Van Fleet, Robertson & Dermott, Joplin, Mo., for plaintiff.

Robert J. Keeter, Schroff, Keeter and Glass, Springfield, Mo., for defendant.

## MEMORANDUM OPINION AND ORDER

JOHN W. OLIVER, District Judge.

### I.

On October 22, 1974 this case was tried before the Court without a jury. Pursuant to an agreement of record, the case was submitted on the evidence adduced at trial plus the various depositions and stipulations filed herein. The parties have submitted proposed Findings of Fact and Conclusions of Law in accordance with directions made at trial. The excellent supporting briefs submitted put clearly in focus the questions presented. Counsel for all parties are commended for the quality and professionalism of their work.

After a careful review of the entire record and the briefs of the parties, we make the following findings of fact and conclusions of law:

### II. FINDINGS OF FACT

1. The original plaintiff in this action, Diplomat Homes, Inc. (Diplomat), was a Missouri corporation.

2. Since the filing of this action, Diplomat has lost its identity due to various mergers, and the emerging corporation is Winston Industries, Inc., an Alabama corporation, who is now the real party in interest and should be substituted for Diplomat.

3. Defendant Commercial Standard Insurance Company (C.S.I.C.) is a Texas corporation and was and is a foreign insurance company authorized to do business in Missouri.

4. Third party defendant Patterson was and is a licensed insurance agent in the State of Missouri.

5. Patterson represents fifteen to twenty insurance companies, including C.S.I.C.

6. At all times pertinent to the issues here involved, there was in force and effect between C.S.I.C. and third-party defendant Patterson an agreement

dated April 1, 1970 which, among other provisions, provided in part:

### AGENCY AGREEMENT

1. This agreement, made and entered into this 1st day of April, 1970 by and between the respective insurance companies whose names are checked in the designated blocks and whose names are subscribed hereto [hereinafter called "Company"], and W. R. Patterson, operating as The Patterson Agency, a [sic] individual of Joplin, Missouri [hereinafter called "Agent"]. and is effective 4–1–70 on New Business and 5–1–70 on Renewal Business.

\* \* \* \* \* \*

WITNESSETH: The Company does hereby appoint and constitute the said Agent as a non-exclusive representative in any state or province in which Agent is licensed for the writing of insurance.

Said appointment is on the terms and subject to the conditions hereinafter stated, which are hereby agreed to by each of the parties hereto.

■ The Agent shall write for the Company only the classes and kinds of insurance as shown on attached schedules, or authorized by the Company in writing, and in full compensation for all services in procuring business for the Company, and all expenses incident thereto, the Company agrees to pay the Agent commissions as shown on attached schedules at the rates computed on the net premiums written and paid to the Company by the Agent, while this agreement is in force.

\* \* \* \* \* \*

■ The Agent may solicit insurance, countersign and issue printed policies of insurance when signed by the President and Secretary of the Company; he may agree upon and collect premiums, renew policies in writing at expiration, cancel any of said insurance, transfer insurance by written endorsement on policies, give the assent of this Company in writing only to the assignment before a loss of any such insurance, but may not bind the said insurance company by oral agreement not evidenced in writing, nor bind this Company on any risk that has been cancelled or refused by another company without first submitting same with full particulars to the Home Office for approval.

\* \* \* \* \* \*

The Agent shall during the entire term of the Agency hereby created use his utmost diligence and best efforts in procuring business for and on behalf of the Company at such rates and upon such terms as may be authorized in the manuals to be furnished or instructions issued from time to time by the Company. The Agent shall exercise care in the selection of risks on behalf of the Company and faithfully observe the duties imposed by this Agreement and obey all rules and instructions, whether written or verbal.

■ The Agent shall keep an accurate record of all policies issued for the Company and shall forward promptly to the Company copies of all evidence of insurance effected by Agent or modifications thereof. The Agent shall not later than the 10th of each month render a statement to the Company showing in detail all policies issued during the previous month. The Agent shall not later than sixty (60) days from the close of the month in which such policies were effective pay to the Company at Fort Worth, Texas, the premiums thereon, whether such premiums have been collected or not.

7. C.S.I.C. imposed no restrictions on Patterson's authority to renew policies and issue binders not expressed in the agency contract.

8. Patterson arranged for Diplomat to have a policy of insurance with C.S.I.C. effective March 6, 1970, which included products liability coverage; this

was Policy No. 430 10 96 09 (hereinafter ". . 09") which expired March 6, 1971.

9. Prior to the expiration of Policy No. . . . 09, Brooks, district manager for Diplomat, sought bids to cover Diplomat for general liability and products liability to take effect March 6, 1971.

10. Diplomat received at least two bids on the insurance coverage sought by Brooks.

11. Patterson was the only one who came up with acceptable coverage which included products liability.

12. Patterson's bid was on coverage he previously had the year before, which included general liability, comprehensive, liability on premises, products liability, fleet liability and total over-the-road physical damage on mobile homes.

13. On February 2, 1971 Patterson asked C.S.I.C. to issue a policy. This was prior to Brooks' deciding that the figures and coverage of C.S.I.C. were best because Brooks decided this around March 1, 1971.

14. Five or six days prior to March 6, 1971 Brooks accepted Patterson's bid for the coverage which was a renewal of the old C.S.I.C. policy.

15. Brooks instructed Patterson to cause a policy to be written effective March 6, 1971.

16. Patterson agreed to renew Policy No. . . . 09 at the instruction of Brooks.

17. The type coverage Patterson had agreed to provide Diplomat is complicated, and in this case was written in the Home Office of C.S.I.C.

18. On or about March 5, 1971, Patterson prepared a binder addressed to Diplomat which stated:

Losses occur when least expected so to avoid any possibility of misunderstanding we're furnishing this acknowledgment for your records until policy or endorsement is ready for delivery.

Effective March 6, 1971 at 12:01 a. m. we are arranging for you as follows: Continuing coverage under Commercial Standard Insurance Company Policy #430 10 96 09, providing public liability and property damage on all operations including equipment, including products insurance, physical damage insurance for collision coverage for trailers being pulled behind tractors; added coverages as indicated under the above policy number THIRTY (30) DAYS.

19. This binder was the same form that Patterson had used many times with C.S.I.C. continuing policies.

20. On March 5, 1971 Patterson prepared a letter of transmittal of the binder, with reference to Policy No. . . . 09 which stated in part:

Thank you so much for talking with me this morning in connection with the above policy which expires March 6, 1971.

At this time I enclose a binder extending the coverages under this policy for a period of thirty days. Within that time the policy will have been renewed and forwarded to my office from the company. When I receive the policy I will contact you and Lyle, come to Noel, and we will sit down and go over the policy to determine the coverage you have and any coverages you do not have but should have and answer any questions which is applicable to the coverages.

21. Patterson sent a signed copy of the binder together with the letter of transmittal to Diplomat.

22. Diplomat received the binder.

23. On March 5, 1971 Patterson, following a telephone conversation with Boles, Commercial Casualty underwriter for C.S.I.C., wrote a letter to Boles which stated in part:

Re: DIPLOMAT HOMES, INC., et al
Policy #430 10 96 09

\* \* \* \* \* \*

Confirming our conversation in connection with this account at this time,

I enclose a binder extending the coverage for 30 days. Will you please issue the renewal forwarding to me at your convenience keeping the filings in effect.

24. The March 5, 1971 letter above was posted in the United States Mails along with the binder addressed to Boles at C.S.I.C.

25. On March 5, 1971, Patterson wrote Sally Berry, an employee of Ryder Truck Rental that, referring to Policy No. . . . 09:

We are continuing the above policy and we have extended the coverage by binder . . .

26. On March 10, 1971, Policy No. 430 11 65 54 (hereinafter ". . . 54"), which by its terms would give insurance coverage to Diplomat, left Boles' office.

27. On March 18, 1971, Patterson wrote Brooks in regard to Policy No. . . . 54, stating in part:

In connection with the above we have your policy in our office now and we are checking it and we have forwarded to you CAB cards and if you need more please be sure and let me know.

I wanted to let you know this and we will have this finished and I will drive down and see you next Monday and we will go over the coverages. I will call you before I come down to be sure that you will be there and have time to go over it with me.

28. On March 18, 1971, a fire occurred in San Antonio, Bexar County, Texas in a mobile home manufactured by Diplomat which resulted in the deaths of two infant children.

29. On March 19, 1971 Patterson wrote Brooks that the filings with the state under Policy No. . . . 54 had evidently been made; C.S.I.C. had forwarded an endorsement to be filed with the State of Mississippi on March 16, 1971; C.S.I.C. had forwarded a certificate of insurance to the State of Kansas on March 19, 1971; certificates had also been filed with the State of Oklahoma and Colorado.

30. On March 23, 1971 Patterson brought the policy to Brooks' office and went over the coverages. He attempted to make physical delivery of the policy, but a dispute arose concerning payment of the premium. Patterson asked Brooks for twenty percent of the premium in cash, together with Diplomat's note on the First State Bank of Joplin for the remainder. Brooks agreed to pay the twenty percent, but refused to sign the note. Instead, he wanted to put at least part of the remaining balance in escrow as leverage on prior existing claims of Diplomat against C.S.I.C. Patterson stated that he would have to contact C.S.I.C. to determine if this was acceptable. Diplomat did not pay the premium, and Patterson did not deliver the policy.

31. On March 24, 1971 Patterson wrote Brooks stating:

This will confirm our visit yesterday at your office in connection with Commercial Standard Insurance Company policies which they have in effect for you, also, in connection with the various losses which we are trying to bring to a conclusion on your behalf.

The Commercial Standard Insurance Company is an old line insurance company and they are a respectable company having been in business for many years. We have found out over the years that they do honor their claims in accordance with the policy contract. I realize that on occasions there are things which happen which is hard to understand in connection with a loss, but the only thing we can do is to work together on this and try to cooperate with each other to the very best of our ability in order to understand the coverages and in order to bring the losses to a satisfactory conclusion. I am contacting the company on the outstanding losses at this time and as soon as I have something on this I will contact you again.

32. On March 25, 1971 Patterson had a telephone conversation with Boles.

33. On March 25, 1971 Boles issued instructions to his typist to issue cancellation notices re Policy No. . . . 54.

34. On March 25, 1971 Patterson wrote Boles, stating in part:

In connection with the above policy [No. . . . 54] you have advised me that the company desires to cancel as a result of the various problems that have come about in connection with your engineers making inspections for safety purposes and also as a result of the operations of the assured.

John in view of the accrued problems on the account the cancellation of this policy can be made. In view of the fact that you have made various filings with the states of Oklahoma, Colorado and others it will take thirty days to effect cancellation. Will you please proceed to notify the states of the cancellation and advise us as to the earned premium on a prorata basis. We will proceed to replace the coverage for our assured within thirty days from now.

35. On March 25, 1971 Patterson wrote Brooks, stating in part:

In connection with the above policy I visited with you in your office on Monday and wrote you a letter on March 24, 1971.

With further reference to the above policy [No. . . . 54] the Commercial Standard Insurance Company indicated that they must cancel the coverage. The company will cancel the coverages however it will be necessary that the States be given proper notice because of the filings which has been made under the policy. We will be able to replace your coverage before the cancellation is effective and I will keep in contact with your office on this matter. There will be an earned premium for the period of March 6, 1971 to the cancellation date.

36. On March 26, 1971 Boles wrote Patterson, stating in part:

This is to confirm our telephone conversation of March 25th in which I asked you to return the above policy for flat cancellation. If this is received within the next few days and we do not have any losses show up on this, a flat cancellation will be agreeable. Thank you for your cooperation in handling this account.

37. Losses did show up.

38. The States of Kansas, Oklahoma and Mississippi would not allow flat cancellation.

39. Brooks, after being notified C.S. I.C. wished to cancel, inquired of Patterson how long he had to get coverage; Brooks also had several conversations with Patterson about getting a bill from C.S.I.C. for the short term coverage.

40. Patterson later arranged for insurance coverage for Diplomat with Gulf Insurance Company after the problems with C.S.I.C. arose.

41. On July 21, 1971 Patterson wrote Boles that he had not received the earned premium figures on the Diplomat policy and requested Boles to check with his audit department and advise.

42. On October 22, 1971 a lawsuit was filed in the District Court for the 57th Judicial District, Bexar County, Texas, Action No. 240,243, styled Donald E. Shaw, et ux vs. Belknap Home Sales of San Antonio, Texas, Inc. and Diplomat Homes Inc.

43. On October 26, 1971 Landrum talked to an attorney in San Antonio, and presumably was advised of the lawsuit at that time.

44. Diplomat first learned of the casualty when the lawsuit was filed.

45. Patterson's first knowledge of the loss in San Antonio, Texas, was in October or November of 1971.

46. On November 5, 1971 Robert Yocom, attorney for Diplomat, made written demand on C.S.I.C. to defend the lawsuit filed in Bexar County, Texas.

**564**

47. Landrum wrote a letter disclaiming coverage.

48. Landrum, in his letter to Yocom disclaiming coverage, also pointed out Diplomat had a duty to mitigate damages, and Landrum demanded that Diplomat fulfill this obligation and see that a defense was afforded for the suit brought.

49. According to Landrum when C.S.I.C. cancels a policy flat, for an interim period, C.S.I.C. is giving free insurance from the date of inception to the date of cancellation.

50. In the event judgment is rendered in favor of plaintiff and against defendant it is stipulated that plaintiff's damage is $26,372.44, which includes $15,000 settlement in the Texas litigation with the remainder for fees and costs in that suit.

### III. CONCLUSIONS OF LAW

*1. At all times during the events involved in this case, Patterson was acting as agent for C.S.I.C. and not as agent for Diplomat.*

Defendant C.S.I.C. argues that the evidence in this case shows that Patterson was an independent insurance broker and as such was acting as an agent for Diplomat during the transaction involving the renewal of Policy No. . . . 09. Under this view of the evidence, C.S.I.C. argues that the various actions taken by Patterson were in fact the actions of Diplomat, and that such actions merely resulted in an offer to buy insurance from C.S.I.C., which it did not accept.

■ We agree Patterson was a "broker," as that term is usually and ordinarily understood. But a broker is not automatically an agent for the insured. As was stated in H & H Manu-

facturing Co. v. Cimarron Insurance Co., 302 S.W.2d 39, 43 (Mo.App.1957); "Whether an insurance broker represents the insured or insurer depends upon the circumstances."

C.S.I.C. attempts to rely upon two factual circumstances to show that Patterson was an agent for Diplomat:

 a. Patterson represented fifteen to twenty insurance companies, including C.S.I.C. [F. 5]

 b. Patterson later arranged for insurance coverage for Diplomat with Gulf Insurance Company after the problems with C.S.I.C. arose.[1] [F. 40]

No one questions the fact that Patterson did act on Diplomat's behalf in regard to some of the matters involved in this case. But that circumstance does not mean that Patterson did not act as C.S.I.C. agent in regard to the controlling factual circumstances of this case. The principles to be applied are stated by the St. Louis Court of Appeals in Meyers v. State Farm Life Insurance Co., 416 S.W.2d 10, 16 (Mo.App.1967):

> We are aware that the general rule in regard to agents is that the same person can not act as agent for both the company and insured. However, this rule is subject to some exceptions. The same person may act for the different principals in separate matters in which their interests are not conflicting and his duties not inconsistent. It is possible for an insurance company agent to become during the progress of the negotiations the agent of the insured; and in that event he may acquire rights, have powers, and incur obligations respecting both insurer and insured. The same person may act in both capacities; he may be the agent for insured, although as to the procuring of the

---

[1]. C.S.I.C. in support of its contention that Patterson was an agent of Diplomat, also stated in one of its suggested conclusions of law that "Patterson had extended Diplomat credit." However, C.S.I.C. has requested no finding of fact in this regard and we accordingly make none. We further conclude that this factual circumstance, when considered with all the other facts and circumstances in this case, does not support C.S.I.C.'s legal argument under applicable law.

insurance he also represents the company. Whether in a particular case or particular matter one acts as agent for the company or for insured depends upon the intention of the parties, which is to be determined from the facts and circumstances of the case.

The facts and circumstances of this case show that after Brooks had solicited bids from various brokers [F. 9], Patterson made a bid on behalf of C.S.I.C. and Brooks accepted [F. 10–14]. Brooks thereafter instructed Patterson to cause the policy to be written [F. 15].

 It is settled law in Missouri that "One who has the authority to take and complete applications for insurance is the agent of the insurer and not the insured." American Fire and Indemnity Co. v. Lancaster, 286 F.Supp. 1011, 1014 (E.D.Mo.1968). Moreover, C.S.I.C. is a foreign insurer who can contract for insurance only through an authorized resident agent. V.A.M.S. § 375.901. Any agent authorized and acting in this capacity is therefore acting on behalf of the insurer. Bennett v. National Fire Ins. Co. of Hartford, 253 Mo.App. 720, 143 S.W.2d 479, 481 (1940). We accordingly conclude that Patterson was acting as an agent of C.S.I.C. at all times during the events involved in this case.

*2. Patterson, as C.S.I.C.'s agent, was authorized to issue the binder on behalf of C.S.I.C. to Diplomat continuing the insurance coverage for thirty days.*

 Defendant C.S.I.C. argues that, assuming Patterson was its agent, he was not authorized to continue the policy for thirty days by issuance of a binder. That argument is not tenable.

The "Agency Agreement" in effect between Patterson and C.S.I.C. specifically gave Patterson the authority to renew policies and to issue binders in writing without prior approval of C.S.I.C. [F. 6] Patterson had in fact issued many binders continuing policies prior to this particular transaction [F. 19]. That is a significant factual circumstance. See Pringle v. Aetna Life Ins. Co., 123 Mo. App. 710, 101 S.W. 130 (1907). It is also significant that after Patterson advised C.S.I.C. of the issuance of the binder involved in this case, C.S.I.C. made no objection whatever [F. 23]. Under these circumstances, we conclude that Patterson was authorized to continue the policy by binder for a period of thirty days. Massachusetts Bonding & Insurance Co. v. R. E. Parsons Electric Co., 61 F.2d 264 (8th Cir. 1932); Chailland v. M. F. A. Mutual Ins. Co., 375 S. W.2d 78 (Mo.1964).

*3. Patterson issued a valid binder of insurance to Diplomat on or about March 5, 1971.*

 C.S.I.C. challenges Findings of Fact 18 through 21, *supra*, on the ground that they have not been proved by proper evidence. C.S.I.C. points out that the only copy of the binder produced at trial was an unexecuted machine copy of a duplicate original retained by Patterson in his file. It concedes that the original was sent to Diplomat and was last in its possession. C.S.I.C. argues that under the "best evidence" rule, Diplomat cannot prove that the binder was in fact issued unless it is able to produce the original binder. C.S.I.C.'s argument must be rejected.

Federal Rule of Evidence 1003 codifies prior law in regard to the admissibility of duplicates:[2]

A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original.

**2.** Though the Federal Rules of Evidence were not in effect at the time this case was tried, it is clear that Rule 1003 does not es-

tablish a new rule of evidence. See Advisory Committee Notes to Rule 1003; Schroer v. Schroer, 248 S.W.2d 617 (Mo.1952).

C.S.I.C. does not raise any real question concerning the authenticity of the original; nor is there, under the circumstances of this case, any question of unfairness which would require exclusion of the duplicate. C.S.I.C.'s reserved objection to the admissibility of the duplicate of the binder is accordingly overruled.

■ We reach the same conclusion with regard to C.S.I.C.'s objection to the admissibility of parol evidence to prove that the binder was in fact executed. Parol evidence of the contents of documents is admissible when the documents are lost "unless the proponent lost or destroyed them in bad faith." Federal Rule of Evidence 1004, see also Kennedy v. Boken Associates, Inc., 381 S.W.2d 39 (Mo.App.1964). In the absence of any evidence of bad faith, C.S.I.C.'s reserved objection is overruled.

4. *The binder of insurance continuing Diplomat's insurance coverage was in effect on March 18, 1971.*

■ C.S.I.C. argues that regardless of the validity of the binder when issued, its coverage had ended before the loss involved in this case occurred on March 18, 1971. That is, C.S.I.C. argues that the binder was merged into Policy No. . : . 54 when the latter was prepared, and that the failure of Diplomat to accept the latter policy ended all coverage. In support of that argument, C.S.I.C. relies on several general statements of law, such as the following quotation from 12 Appleman Insurance Law and Practice, § 7221, p. 307:

> The issuance of a binder evidences a complete, temporary or preliminary contract of insurance effective from that time until issuance of the formal policy or until rejection of the risk.

That broadly stated general principle does not purport to qualify the established rule that the duration of a particular binder is governed by the express terms stated in the particular instrument involved in a particular case. The particular binder involved in this case expressly provided that effective March 6, 1971 C.S.I.C. was providing continuing insurance coverage for Diplomat for a period of thirty days. Indeed, as is apparent from our finding 18, the binder expressly identified the binder's coverage as the same coverage as that provided in Policy No. . . . 09.

Applicable law requires that the binder be construed in a reasonable manner, giving effect to the intent of the parties. Miravalle Supply Co. v. El Campo Rice Milling Co., 181 F.2d 679 (8th Cir.), cert. den. 340 U.S. 822, 71 S.Ct. 56, 95 L.Ed. 604 (1950); State Mutual Life Assurance Co. of Worchester v. Dischinger, 263 S.W.2d 394 (Mo.1953). Any possible conflict in the expressed intention of the parties as may be apparent between printed and typewritten portions of the document will be resolved in favor of the latter. Miravalle Supply Co. v. El Campo Rice Milling Co., *supra*; National Heater Co. v. Corrigan Co. Mechanical Contractors, 482 F.2d 87 (8th Cir. 1973).

The clear intent of the parties in the present case was to continue the coverage of Policy No. . . . 09 until a new policy could be issued. We expressly find and conclude that the binder was not contingent or conditioned upon delivery of a new policy. Indeed, any contrary construction of the binder would render the thirty day period for the effective coverage of the binder virtually meaningless and subject to being voided by some sort of unexpressed condition subsequent.

The construction we have given the binder is consistent with the actual construction given it by the parties. That circumstance must be given appropriate recognition under applicable law. See H. K. Porter Co. v. Wire Rope Corp. of America, 367 F.2d 653 (8th Cir. 1966); Aetna Casualty & Surety Co. v. Haas, 422 S.W.2d 316 (Mo.1968). Patterson's letter to Boles of March 5, 1971 stated that he was enclosing "a binder extending the coverage under the policy for a

period of thirty days." [F. 20] Later on that day, after a phone call to Boles, Patterson again made reference to the "binder extending the coverage for 30 days." The evidence shows that the parties in fact continued to consider the coverage in effect even after Patterson's failure to deliver Policy No. . . . 54. See F. 31, 34, 35 and 36, *supra*. For all these reasons, we find and conclude that the binder continued insurance coverage for Diplomat for a period of 30 days beginning March 5, 1971.[3]

5. *The binder of insurance issued by C.S.I.C. covered the loss arising from the trailer fire in San Antonio, Texas on March 18, 1971.*

Defendant C.S.I.C. in its suggested conclusions of law admits that, if its coverage was in force, it is required by law to pay for Diplomat's defense and court costs. C.S.I.C. argues, however, that Diplomat is not entitled to reimbursement for the $15,000 paid in settlement since there is no proof that the loss actually fell within the terms of the coverage. This argument is clearly without merit.

At the close of the trial of this case, the Court, after conferring with counsel off the record, stated:

Let the record show that after conferring with counsel, a matter should be stated of record which resolves any dispute about the amount of damage in the event judgment should be rendered in favor of the plaintiff and against the defendant.

Counsel thereafter agreed on the record that this amount should be $26,372.44, including the $15,000 paid in settlement. The argument presently made by C.S.

I.C. appears to be completely inconsistent with the agreement of counsel made on the record.

In any event, the evidence on the record conclusively demonstrates that the insurance covered the loss at issue. C.S.I.C. concedes that "the allegations in the damage suit petition [in Texas] are sufficient to have obligated defendant to defend if it had coverage." See Suggested Conclusions of Law by Defendant, p. 7. Where, as here, it is subsequently determined that coverage existed, the insurer is liable for the amount of any reasonable settlement made between the insured and the claimant. Southwestern Bell Telephone Co. v. Western Casualty & Surety Co., 269 F.Supp. 315 (E.D.Mo.1967); Annot. 49 A.L.R.2d 694, 744–45 (1956).

6. *Defendant C.S.I.C.'s third-party complaint against third-party defendant Patterson should be dismissed.*

On November 29, 1974, this Court was advised by letter from counsel for C.S.I.C. that it intended to seek no findings with regard to its third-party complaint against Patterson. The reason given for this inaction was that Diplomat had apparently elected to proceed solely on the express contract theories stated in Counts II and V of the original complaint and had abandoned Counts III and IV, which alleged oral contract and estoppel, respectively. Since the third-party complaint sought indemnity from Patterson only in the event C.S.I.C. was found liable on Count II or V, counsel properly concluded that third-party action would be mooted unless those counts were revived.

---

3. Even under C.S.I.C's argument that the binder expired when Policy No. . . . 54 was ready for delivery, it is apparent that we would be required to find and conclude that the binder was in effect on March 18, 1971. The undisputed evidence establishes that when Policy No. . . . 54 left Boles' office on March 10, [F. 26] it was not ready for delivery. Nor was the policy ready for delivery on March 18. For it was on that date that Patterson wrote Brooks that he was still "checking it" and that he "will have this [policy] finished" by March 23 [F. 27]. It is therefore clear that it was not until Patterson went to Diplomat's offices on March 23 that the policy was actually ready for delivery [f. 30]. Thus, even under C.S.I.C.'s proposed construction of the binder, it was in effect on March 18, 1971.

As our above findings make clear, we find and conclude that C.S.I.C. is liable solely on the express contract represented by the binder of insurance. The third-party complaint must accordingly be dismissed.

### IV.

Accordingly, and for the reasons stated, it is

Ordered (1) that the Clerk, pursuant to Rule 58 of the Rules of Civil Procedure, shall forthwith prepare, sign and enter a judgment for the plaintiff against the defendant in the amount of $26,372.44, plus costs. It is further

Ordered (2) that the third-party complaint should be and hereby is dismissed.