TRANSAMERICA INTERWAY, INC.,
Transamerica ICS, Inc., Plaintiffs,

v.

COMMERCIAL UNION ASSURANCE
COMPANY OF SOUTH AFRICA, LTD.
and Incorporated General Insurances,
Ltd., Defendants.

No. 81 Civ. 7067 (ADS).

United States District Court,
S.D. New York.

March 2, 1983.

# 420

Ober, Grimes & Shriver by Kieron F. Quinn, New York City, for plaintiffs.

Bigham, Englar, Jones & Houston by Joseph J. Magrath, New York City, for defendant Commercial Union Assur. Co. of South Africa, Ltd.

Rein, Mound & Cotton by C. Raymond Nelson, New York City, for defendant Incorporated General Insurances, Ltd.

## MEMORANDUM OPINION AND ORDER

SOFAER, District Judge:

In this action Transamerica Interway, Inc. and Transamerica ICS, Inc. (both hereinafter "ICS" or "plaintiff") seek to collect on certain policies of marine insurance issued during 1980 and 1981 by defendants Commercial Union Assurance Company of South Africa, Ltd. (hereinafter "Commercial Union") and Incorporated General Insurances, Ltd. (hereinafter "IGIL"). ICS, a lessor of international ocean cargo containers, obtained these policies to protect against any loss occasioned by the insolvency or bankruptcy of one of its lessees. The policies were negotiated through Jardine Matheson Insurance Brokers Ltd. of London, England, and its South African affiliate Jardine Glanville Insurance Brokers S.A. (Pty) Ltd. (both hereinafter "Jardine").

The tortuous history of this case began in October 1981 when ICS submitted claims on a Commercial Union policy dated January 16, 1981 and an IGIL excess coverage policy dated April 1, 1981. Both defendants refused to pay the claims. On October 30, 1981, Commercial Union filed a writ in the Queen's Bench Division in England for a declaratory judgment relieving it of liability on the ICS policies. (IGIL was not a party to this English action.) On November 13, 1981, ICS filed its complaint in this Court seeking damages of $15.2 million from Commercial Union and IGIL. Both defendants moved to dismiss the action claiming to be South African companies, beyond this Court's jurisdiction. ICS cross-moved for discovery on the jurisdictional issue. On January 19, 1982 this Court found that issues of fact existed on the jurisdictional question, and ordered all parties to participate in discovery limited to jurisdiction. The Court reserved judgment on defendants' motion to dismiss and noted that defendants did not waive the right to assert their jurisdictional defense by complying with the Court's limited discovery order. Defendants refused to participate, however, despite the Court's Order and assurances.

On April 12, 1982 IGIL made a motion asking to be relieved from the prior Order requiring it to participate in discovery. In an Order dated June 9, 1982, IGIL's motion was denied on the authority of *Insurance Corp. of Ireland Ltd. v. Compagnie des Bauxites de Guinea,* 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982), which clarified the power of the federal courts to impose sanctions upon any party who violates an order directing discovery on jurisdictional issues and specifically held that failure to comply with such discovery orders may be a proper basis for an order finding personal jurisdiction. On June 9, the Court also ordered IGIL to pay $805 to ICS for attorney's fees and costs in connection with the motion to be relieved from discovery, IGIL having failed to comply with the Court's January 19 order.

Defendants persisted in refusing to comply with discovery, despite this Court's second Order and the Supreme Court's holding in *Ireland.* In July 1982 ICS moved under Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure for an order that *in personam* jurisdiction exists over defendants. Defendants responded by claiming (1) that plaintiff was unfairly using defendants' refusal to cooperate in discovery to obtain a judgment when it lacks even a colorable basis for jurisdiction; (2) that defendants would be prejudiced under South African law if they cooperated even for the sole purpose of determining the jurisdictional issue; and (3) that this Court should defer to the British court for a decision on the policies' coverage, rather than imposing a sanction that will result in a default judgment instead of a ruling on the merits.

The Court resolved to consider the issues in depth, treating its power under Rule 37 as discretionary, and recognizing that the three arguments raised by defendants could conceivably justify refusing plaintiff the relief it sought. Accordingly, the Court ordered on August 30, 1982 that the parties submit all available information on these issues, including detailed information from ICS and Jardine on how the policies were solicited and negotiated, and a status report on the English action and which if any of the parties in this case would be bound by a determination in that forum.

Plaintiff ICS has established a basis for this Court's jurisdiction over defendants which refutes any claim that plaintiff is proceeding in bad faith. ICS originally sought to obtain jurisdiction over defendants under Section 59-a of New York Insurance Law which subjects out-of-state insurers to the jurisdiction of the New York courts where they have "effected by mail or otherwise ... (1) the issuance or delivery of contracts of insurance to ... corporations authorized to do business [in New York], (2) the solicitation of applications for such contracts, (3) the collection of premiums ... for such contracts, or (4) any other transaction of business." N.Y.Ins.Law § 59-a.2.-(a). To establish jurisdiction under the statute, ICS has the burden of proving the requisite "minimal contacts" between defendants and New York so as to comport with established standards of due process. *See Ford v. Unity Hospital,* 32 N.Y.2d 464, 346 N.Y.S.2d 238, 299 N.E.2d 659 (1973). Both Commercial Union and IGIL are corporations organized under the laws of, and doing business in, the Republic of South Africa; they conduct no business, maintain no office or staff, nor keep any assets in New York. If *in personam* jurisdiction is to be established over defendants, therefore, it must be because Jardine acted as defendants' agent for the purpose of performing any of the acts enumerated in § 59-a.2.(a).

A broker such as Jardine is primarily the agent of the first person who employs him, and is therefore ordinarily the agent of the insured. 29 N.Y.Jur. § 425; 3 Couch on Insurance 2d § 25:94. The question whether an insurance broker represents the insurer, the insured, or both depends, however, on the circumstances of each case, including the conduct of and communications among the parties. 29 N.Y.Jur. § 425; 3 Couch on Insurance 2d § 25:93. A broker may be an agent for the insured as to some aspects of a policy and an agent for the insurer as to different aspects of the same policy. 29 N.Y.Jur. § 423; 3 Couch on Insurance 2d § 25:93. Thus, for example, while an insurance broker may act for the insured in applying for and processing a policy, the broker generally acts for the insurer in delivering the policy and in collecting and remitting the premiums. *Mord v. Hartford Accident & Indemnity Co.,* 245 N.Y. 279, 283–84, 157 N.E. 138 (1927); *In re Sommer's Estate,* 12 N.Y.S.2d 47, 49 (Surrogate's Ct.1939); *Globe & Rutgers Fire Ins. Co. v. Lesher, Whitman & Co.,* 126 Misc.Rep. 874, 215 N.Y.S. 225 (City Ct.1926); 29 N.Y.Jur. § 426; 3 Couch on Insurance § 25:95.

In this case both insurer and insured have strenuously denied the existence of any agency relationship with Jardine. ICS stresses that it did not solicit the insurance, but rather that Jardine solicited ICS in December 1979 concerning the procurement of policies in the South African market. Affidavit of Jay Kaplan ¶ 8 (Sept. 29, 1982). ICS further argues that, throughout the negotiations regarding the terms and conditions of the policies, ICS made clear that all provisions were subject to its final approval in New York, *id.* at ¶ 14, and that Jardine's lack of authority to bind ICS supports an inference that during this process Jardine was acting as the insurer's rather than the insured's agent. ICS states finally that the policies were delivered to New York by Jardine, *id.* at ¶ 13, that the premiums were paid in U.S. dollars from New York to Jardine, *id.* at ¶¶ 17, 18, and that subsequent claims on the policies were transmitted in the same manner as the premiums, *id.* at ¶ 19. Commercial Union and IGIL also claim that Jardine originally contacted them, seeking an insurance market for the ICS risk. Affidavit of David Patrick Ste-

vens-King ¶ 6 (July 30, 1982); Affidavit of Derrick Herbert Emery ¶ 6 (Dec. 17, 1981). Defendants state that all terms and conditions were prepared by Jardine based upon the needs of ICS and were merely submitted to the South African insurers, Emery Affidavit, *supra* at ¶ 12; Stevens-King Affidavit, *supra* at ¶ 7, and that all premiums and claims were submitted to them in South Africa by Jardine acting as plaintiff's agent, Emery Affidavit, *supra* at ¶ 15.

■ On this record, neither side has proved its position with a degree of assurance that might permit reliable findings and conclusions without further discovery. While plaintiff has not at this time carried its burden of demonstrating an agency relationship between defendants and Jardine, it has shown that such a relationship is reasonably possible. In this connection, it may be significant that Jardine also has refused to respond to ICS' discovery requests. While this behavior does not prove that Jardine acted as defendants' agent, Jardine admitted in a communication sent to ICS that, if such an agency relationship did in fact exist, any disclosure on their part would breach their duty to a client. Affidavit of Kieron F. Quinn (Sept. 27, 1982), Exhibit N (telex of David Higgins to Kieron Quinn, June 23, 1982).

Defendant IGIL incorrectly contends that, since Jardine was what is referred to in the insurance business as a "surplus lines" broker, the agency question can be resolved without further inquiry. According to IGIL, *Friedland v. Commonwealth Fire Ins. Co.*, 143 App.Div. 570, 128 N.Y.S. 705 (2d Dep't 1911), *aff'd*, 207 N.Y. 705, 101 N.E. 1102 (1913) stands for the proposition that "surplus lines" brokers are always agents of the insured and not of the insurer. The Court in *Friedland*, however, was simply interpreting § 137 N.Y.Ins.Law (now § 122 N.Y.Ins.Law), which provided for the licensing of in-state brokers so they could service their New York clients through out-of-state insurers. Based on what the Court felt was the legislative purpose behind the section, it decided that in-state "surplus lines" brokers should be

deemed the agents of their in-state clients. Jardine, operating as it did out of London and Johannesburg, is not in a position analogous to that of the New York broker in *Friedland.*

In short, whether a broker is the agent for the insured, the insurer, or both is a question which depends upon all the relevant circumstances, including the conduct of and communications among the parties. Defendants' refusal to comply with this Court's discovery orders has prevented the disclosure of this information, and, as a result, has prevented a full airing of the jurisdictional claim.

The second argument advanced by defendants for their refusal to participate in discovery on jurisdiction is that if they did a South African court "may well hold" that the insurers tacitly submitted to the jurisdiction of this Court for all purposes. Affidavit of C. Raymond Nelson ¶¶ 4–5 (April 12, 1982). That proposition, stated in an unsworn memorandum of a South African attorney, is valueless both as evidence and as legal argument. The proper manner for proving foreign law is set forth in Rule 44.1 of the Federal Rules of Civil Procedure, with which defendants have failed even to attempt to comply. Furthermore, the memorandum does not suggest that South Africa imposes any obligation upon defendants to refuse to permit discovery. Finally, defendants' argument is fundamentally flawed in that it appears to assume that some injustice would flow from a conclusion in South Africa that defendants have submitted to this Court's jurisdiction. That conclusion would prejudice defendants only if this Court finds them in fact subject to its jurisdiction, and if a judgment is thereafter entered against them. This Court cannot readily assume that unfairness or injustice would result if defendants over whom the Court has personal jurisdiction are required to pay judgments properly entered against them. Nothing in defendants' submission suggests any conceivable prejudice from their participation, in the event their position on jurisdiction is upheld, since in that event plaintiff would

never secure judgments against defendants in this country that could be enforced in South Africa.

Defendants' position in refusing to submit to jurisdictional discovery in this Court because of allegedly adverse consequences under foreign law is somewhat analogous to that of an individual who, despite a grant of use immunity by the United States, asserts his fifth amendment privilege against self-incrimination based on an alleged fear of foreign prosecution. The Second Circuit has recently held that such an individual must "demonstrate a real and substantial risk, as distinguished from a mere possibility, that answers to questions might provide a link which would lead to incrimination of him and be used in a foreign prosecution of him." *In re Grand Jury Witness,* 699 F.2d 71 at 75 (2d Cir.1983); *United States v. Flanagan,* 691 F.2d 116, 121 (2d Cir.1982). Neither defendant has demonstrated a "real and substantial risk" that, by complying with this Court's discovery order on the jurisdictional issue, it will suffer any harm under the laws of South Africa. Indeed, neither has satisfied the most minimal standard conceivable on this issue; neither has shown any credible risk of harm, let alone of unjust harm.

Defendants also argue that this Court should defer to the English courts where, as previously mentioned, Commercial Union has filed a writ in an attempt to avoid the insurance policies in question. This is an argument to which the Court has given considerable weight. The English action was commenced before the present action, and it could result in a determination of one defendant's liability under the policies at issue; moreover, the choice-of-law provisions in the policies specify that the policies are to be governed by the "law of the United Kingdom." On balance, however, these considerations are outweighed by those that favor this Court's determination of the jurisdictional issue. The English action was commenced first, but not necessarily in order to obtain a prompt ruling from the English court. Little if anything has been done by Commercial Union to press that action to a conclusion, despite the ab-

sence of any jurisdictional dispute. That action has been pending since October 30, 1981 and nothing has happened on the merits; in fact, the English court ruled on January 26, 1983, that it would not proceed with that case until this Court decided what it intended to do in this case. Furthermore, while the English action could conceivably result in a decision that bound Commercial Union and plaintiff, defendant IGIL is not a party in the English action. From the presently available information, while it appears likely that the English court's decision on some questions will affect both Commercial Union and IGIL, differences in the positions of these parties makes it equally likely that, whatever the determination of the English court, the claim by ICS against IGIL will still need to be litigated. Finally, plaintiff claims that the choice-of-law provision is entitled to no weight, since no such thing as "law of the United Kingdom" exists (the law regarding the enforcement of contracts differs, for example, between England and Scotland). This argument seems weak, since we can be sure at least that the parties did not want American law (state or federal) to govern the policies. In any event, however, choice of law is not the equivalent of choice of forum, and the "law of the United Kingdom" can with adequate competence be applied in this Court.

The contacts between these policies and New York makes this Court at least as appropriate and convenient a forum as the courts of England. The insured is a New York based company, much of the negotiations concerning terms and conditions of the policies were carried on here, and plaintiff's records of payment of premiums and submissions of claims are all located here. Two of defendant Commercial Union's vice-presidents came to New York to inspect these records in October 1981. ICS's request to litigate in this Court cannot therefore be considered either inconvenient or an attempt to harass defendants. *See Thomson v. Palmieri,* 355 F.2d 64 (2d Cir.1966).

In sum, the claims raised by defendants do not justify withholding sanctions for

their persistent refusal to comply with this Court's discovery orders. The Court therefore grants plaintiffs' motions and orders that *in personam* jurisdiction exists over Commercial Union and IGIL pursuant to Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure.

 The prospect of obtaining defendants' cooperation on the merits of this action seems dim. They have already informed the Court, through counsel, that they have no intention of submitting to the Court's jurisdiction. Furthermore, in paragraph 35 of its brief submitted in the English action, Commercial Union states that it "will not take part in any actions in New York even if the Court were to hold that it had jurisdiction *in personam* to hear the case." Under these circumstances, while defendants must be offered an opportunity to appear and defend, that opportunity will be brief, as their resistance to discovery has already caused significant costs and delay. Commercial Union and IGIL are therefore ordered to submit answers to the complaint within ten (10) days of this Order, or judgment will be entered against them by default. *See* Fed.R.Civ.P. 12(a)(1).

SO ORDERED.