**Charles H. BRIGGS, Plaintiff and Respondent,**

v.

**Fern F. LIDDELL, aka Fern Flint, Defendant and Appellant.**

No. 19351.

Supreme Court of Utah.

April 15, 1985.

Kelly G. Cardon, Ogden, for defendant and appellant.

Richard Thornley, Ogden, for plaintiff and respondent.

ZIMMERMAN, Justice:

This is an appeal from a trial court determination that decedent had mistakenly designated her sister, defendant, as the primary rather than the contingent beneficiary under a life insurance policy and that allowed reformation of the contract in favor of decedent's husband, plaintiff. Because reformation of a contract may not be granted upon a showing of unilateral mistake, and because there is no substantial record evidence to support a finding of mutual mistake, we reverse.

Marjorie and Charles Briggs opened a joint checking account at the Bank of Utah. At the same time, they joined a bank club that provided bank customers with a variety of services and benefits. Among these was a $10,000 life insurance policy on each bank club member. Under the terms of the policy, in the absence of an express written designation of beneficiary, upon the death of the insured, $10,000 would be paid to the insured's surviving spouse.

When they opened the account and acquired the insurance policy, neither Marjorie nor Charles Briggs formally designated a beneficiary. Some six weeks later, however, Marjorie Briggs went to the bank by herself and executed a change of beneficiary form naming her sister, Fern F. Liddell, as beneficiary under her policy. After Marjorie died, Fireman's Fund paid the $10,000 death benefit to her sister in accordance with this designation.

Plaintiff Charles Briggs filed suit against Fern Liddell, contending that Marjorie had intended to make her sister a contingent rather than a primary beneficiary so that Fern would recover only if both Marjorie and Charles died together in a single accident. The one-page complaint, in which Charles sought to recover the $10,000 from Fern, alleged that the designation of Fern as primary rather than contingent beneficiary occurred "through inadvertence and mistake."

The matter was tried without a jury. At trial, Charles testified that, at the time the policy was purchased, he and Marjorie discussed naming Fern as the contingent beneficiary but that each intended the surviving spouse to be the primary beneficiary. Charles offered no testimony about Marjorie's intent six weeks later when she designated Fern as her beneficiary. Nor did

Charles present any evidence from bank employees or other witnesses who might be able to shed light upon Marjorie's intent on the day she executed the change in beneficiary form. Fern, on the other hand, testified that Marjorie had from time to time expressed a desire to leave her insurance proceeds to Fern. Fern's testimony was corroborated by her daughter and a third party.

At the conclusion of the trial, the court filed a memorandum decision stating that "the intentions of the plaintiff and plaintiff's wife to make defendant the primary beneficiary never existed. Defendant was to become beneficiary only in the case of the simultaneous death of both plaintiff and plaintiff's wife." The court also entered findings of fact and conclusions of law in which it found that the erroneous designation of Fern Liddell as primary beneficiary was the result of "inadvertence and mistake." Based upon these findings, the court concluded that Charles, as the intended primary beneficiary, was entitled to judgment for the policy amount of $10,000 plus interest and costs.

■ Before this Court, Charles supports the judgment below by arguing that this is essentially an equitable action for reformation and that the ground for reformation is mistake—Marjorie erred when designating her sister as primary rather than contingent beneficiary. This argument fails because Marjorie's mistake, if any, was entirely unilateral. Marjorie may indeed have been mistaken as to the effect of the change of beneficiary form she executed, but those on the other side of the transaction, the bank and the insurance company, were not. The mistake of only one party to an instrument, as occurred here, will not afford relief by reformation.

■ As we have recently stated, a court's equitable powers are narrowly bounded. "A court does not have carte blanche to reform any transaction to include terms that it believes are fair." *Cunningham v. Cunningham*, Utah, 690 P.2d 549, 552 (1984). A contract may be reformed for either of two reasons. First, if the instrument does not embody the intentions of both parties to the contract, a mutual mistake has occurred, and reformation is appropriate. Second, if one party is laboring under a mistake about a contract term and that mistake either has been induced by the other party or is known by and conceded to by the other party, then the inequitable nature of the other party's conduct will have the same operable effect as a mistake, and reformation is permissible. *E.g., Thompson v. Smith*, Utah, 620 P.2d 520, 523 (1980). Under either set of circumstances, because courts are reluctant to change contractual obligations and rights, the party seeking reformation must plead the circumstances constituting the mistake with particularity. Utah R.Civ.P. 9(b); *Neeley v. Kelsch*, Utah, 600 P.2d 979, 981 (1979). Additionally, the party seeking reformation must establish the mistake by clear and convincing proof that "clinches what might be otherwise only probable to the mind." *Greener v. Greener*, 116 Utah 571, 212 P.2d 194, 204 (1949); *accord Bown v. Loveland*, Utah, 678 P.2d 292, 295 (1984).

Reformation is frequently sought in cases arising under insurance contracts when there is a dispute over who is the intended beneficiary. The cases uniformly hold that a unilateral mistake will not support reformation. In *Light v. Equitable Life Assurance Society*, 56 N.C.App. 26, 286 S.E.2d 868 (1982), decedent, owner of three life insurance policies, executed a change of beneficiary form in favor of his then girlfriend. Inadvertently, one policy was omitted from the change of beneficiary form. When decedent died and the proceeds of that policy were awarded to his first wife, his former girlfriend (who had since become his wife) sought reformation of the change form based on a theory of mutual mistake. The North Carolina Supreme Court, finding no evidence of mutual mistake, held that the responsibility for properly executing the change of beneficiary form rested solely with the insured. Because the insurance company's role was limited to providing the form on which the changes were made, any mistake that may

have occurred was unilateral and could not provide the basis for reformation. *Id. See also Urquhart v. Alexander & Alexander*, 218 Md. 405, 147 A.2d 213 (1958); *Insurance Co. of North America v. Bechtel*, 36 Cal.App.3d 310, 111 Cal.Rptr. 507 (1974).

■ The complaint in this action did not assert that a mutual mistake of fact had occurred, thus making reformation an appropriate remedy. It stated only that Marjorie erroneously designated Fern as primary rather than contingent beneficiary. No evidence was presented at trial of mutual mistake by Marjorie, on one hand, and the bank or the insurance company, on the other. Nor was there any evidence that the bank or insurance company either induced a mistake or knew of and took advantage of one. The trial court's findings and conclusions do not address the issue of mutual mistake. The judge found only a unilateral mistake. Under settled law, therefore, the trial court erred in applying the doctrine of reformation.

■ In an attempt to avoid reversal, Charles asserts that the evidence introduced at trial is sufficient not only to show a unilateral mistake, but also to show a mutual one. Charles claims that both Marjorie and the bank erred because the bank inadvertently designated Fern Liddell as a primary rather than a contingent beneficiary. Beyond pointing out that the bank provided Marjorie Briggs with the form it routinely used for all changes of beneficiary, Charles fails to indicate any fact which demonstrates that the bank made such a mistake. And a review of the record reveals no evidence that Marjorie's alleged intention was communicated to the bank, thus making the provision of the form a mistake by the bank. There is simply no evidence of mutual mistake.[1]

■ Although Charles did not ask for rescission, it is incumbent upon us to determine whether this equitable doctrine can

provide an alternative ground for affirmance. Under proper circumstances, rescission is available as a remedy for a unilateral mistake of fact. We have outlined the following elements that must be established in order to obtain such relief:

(1) The mistake must be of so grave a consequence that to enforce the contract as actually made would be unconscionable.

(2) The matter as to which the mistake was made must relate to a material feature of the contract.

(3) Generally the mistake must have occurred notwithstanding the exercise of ordinary diligence by the party making the mistake.

(4) It must be possible to give relief by way of rescission without serious prejudice to the other party except the loss of his bargain. In other words, it must be possible to put him in statu quo.

*Ashworth v. Charlesworth*, 119 Utah 650, 656, 231 P.2d 724, 727 (1951), *quoting Hurst v. National Bond & Investment Co.*, 96 Fla. 148, 117 So. 792, 809 (1928).

■ Viewing Charles' evidence favorably, it was still deficient with respect to at least one element; *i.e.*, establishing that the error occurred despite Marjorie's exercise of due care in executing the change of beneficiary form. As noted above, the evidence adduced at trial did not suggest that Marjorie erred.[2] Under the facts of this case, this Court cannot affirm the result reached below on the theory of rescission.

Reversed. Costs to defendant.

HALL, C.J., and HOWE and DURHAM, JJ., concur.

STEWART, J., concurs in the result.

---

1. In fact, it appears that the evidence presented at trial failed to establish even that Marjorie made a mistake. Charles' testimony about what he thought Marjorie intended on the day the accounts were opened cannot logically be considered "clear and convincing evidence" of what she intended six weeks later.

2. *See* note 1, *supra*.