The AMERICAN INSURANCE
COMPANY, a New Jersey
corporation, Plaintiff,

v.

FREEPORT COLD STORAGE, INC., a
Utah corporation, Defendant.

Civ. No. C85–257G.

United States District Court,
D. Utah, C.D.

May 26, 1987.

Donald J. Purser, Salt Lake City, Utah, for plaintiff.

John A. Adams, Colin King, Salt Lake City, Utah, for defendant.

## MEMORANDUM DECISION AND ORDER

J. THOMAS GREENE, District Judge.

This matter came before the court on March 23, 1987, pursuant to Motions for Summary Judgment by both parties. Plaintiff, the American Insurance Company ("American") was represented by Donald J. Purser. Defendant, Freeport Cold Storage, Inc. ("Freeport") was represented by John A. Adams, and defendants-in-intervention, Underwriters at Lloyds, London and the Pillsbury Company, were represented by Colin King. Plaintiff and defendant both submitted extensive memorandums and presented substantial oral arguments after which the matter was taken under advisement. The court now being fully advised sets forth its Memorandum Decision and Order.

### FACTUAL BACKGROUND

Freeport operates a cold storage warehouse facility in Clearfield, Utah. This case arises out of the collapse of a portion of the roof of Freeport's facility. The collapse caused damage to Freeport's building and equipment as well as to the property of others stored in Freeport's facility. At the time of the roof collapse American insured Freeport's facility. For some years prior to the collapse Freeport had arranged for its insurance needs through the firm of Rollins, Burdick Hunter of Oregon, Inc. ("RBH"). RBH is a licensed insurance broker. RBH may place insurance with as many as one hundred insurance companies, but most of its business is done with twenty-five to thirty companies. RBH entered into an "Agency Agreement" with American which became effective on January 1, 1981. The agreement provided RBH with the authority to "offer and receive proposals for insurance" for the lines of business indicated in certain schedules which were incorporated into the agency agreement. The agreement also provided RBH with authority "to accept and bind proposals for insurance" as provided within another schedule entitled "Schedule of Commission and Limits of Authority."

Prior to 1982, Freeport had contracted through RBH for property insurance with Affiliated FM Insurance Company ("Affiliated FM"). Coverage under that pre-existing policy was to expire on March 1, 1982. It is not clear from the agreed facts whether RBH or Freeport initiated negotiations to obtain a replacement to the coverage under the Affiliated FM policy. In any event, on February 26, 1982, Edward Arietta, an employee of RBH, sent Freeport a letter indicating that coverage broader than that under the Affiliated FM policy could be obtained at a lesser cost from American. Freeport apparently acquiesced to the suggestion contained in the letter, and Harold M. Barnett, the Commercial Lines Manager in American's Portland office, entered into negotiations with H.A. Richard Locke, RBH's Marketing Manager, for issuance of a new policy to Freeport. Thereafter, American issued policy number F–417 11 70 to Freeport, effective March 1, 1982.

From time to time, both before and after the American policy was issued, RBH suggested that Freeport acquire "Warehouseman's Legal Liability" insurance. In a letter dated July 27, 1977, RBH quoted Freeport a rate for insurance coverage for Warehouseman's Legal Liability. In a letter dated July 11, 1978, RBH again offered Warehouseman's Legal Liability insurance to Freeport, enclosing a blank policy form for Freeport's review. Similar letters were sent at other times, including one which was dated June 1, 1983, after Freeport had obtained insurance from American, but before the roof collapse. Freeport declined to obtain this additional coverage for which substantial additional premiums would have been payable.

On March 3, 1984, a portion of the roof of Freeport's warehouse collapsed damaging Freeport's building and some of its equipment, and damaging frozen vegetables owned by the Pillsbury Company. Pillsbury and its insurance company, Lloyd's of London, filed a lawsuit seeking to hold Freeport liable for the damage to Pillsbury's vegetables. On February 14, 1985, Freeport's counsel made written demand upon American to undertake to defend and indemnify Freeport with regard to Pillsbury's claim. American then filed this declaratory judgment action, seeking a ruling that the policy it issued to Freeport does not cover damages to the goods of Freeport's customers.

The policy in question as issued March 1, 1982, is entitled "Standard Fire Insurance Policy." It consists of a number of printed pages, and twelve typed pages. The typed pages are designated as "Marketing Form 701" ("Form 701").[1] RBH submitted Form 701 to American to use as the basis for coverage of Freeport. The dispute here centers on interpretation of Form 701. First, there is a dispute over the meaning of the section entitled "Property Covered," which reads as follows:

Except as specifically excluded herein, *this policy covers all property of an insurable nature*, now existing or hereafter acquired, including the insured's interest in improvements and betterments, at all locations, owned, used, leased, occupied, or otherwise at the risk of the insured, *or for which the insured is legally liable* or for which the insured has assumed liability prior to loss. (Emphasis added.)

Second, there is a dispute over whether the policy contains a provision for co-insurance. Freeport contends there is no co-insurance requirement under the policy because there is no co-insurance clause in Form 701. Third, there is dispute over the meaning of paragraph "C" of the "Property Excluded" section which excludes from coverage:

Property which, at the time of loss, is covered by specific marine, inland marine, or transportation insurance.

The case is now before the court on motions for summary judgment by both parties. American seeks summary judgment against Freeport as to Freeport's Counterclaim for bad faith and punitive damages, and Freeport's Counterclaim for breach of contract. American also asks the court to rule that RBH was acting as Freeport's agent in negotiations for insurance

---

1. Form 701 was drafted by RBH and submitted for review to several insurance companies.

with American. Freeport urges the court to grant summary judgment against American. In the alternative, Freeport moves for partial summary judgment on three issues: (1) that the language of the "Property Covered" section of the policy, described above, provides coverage to Freeport for loss to goods of third persons, and that there is such coverage absent mutual mistake; (2) that there is no co-insurance requirement under the policy; (3) that the "Property Excluded" section of the policy dealing with specific marine, inland marine or transportation coverage applies only to exclude goods covered by policies in which Freeport is the named insured. The court will discuss the parties' motions in the order presented.

## ANALYSIS

### A. AMERICAN'S MOTIONS

#### 1. Bad Faith Claim based upon Failure to Perform Alleged Duty to Defend

American asks the court to grant summary judgment in its favor on Freeport's third counterclaim in which Freeport alleges that American has a duty to defend Freeport in its litigation with Lloyds, and that American's failure to pay Lloyds' claim or to defend the lawsuit constitutes a breach of American's implied covenant of good faith and fair dealing. For breach of this covenant Freeport requests compensatory and punitive damages. American contends that it is entitled as a matter of law to judgment dismissing this counterclaim in its entirety. American argues that the facts of this case do not present a cognizable bad faith claim. Utah law recognizes two basic types of bad faith claims. In *Beck v. Farmer's Insurance Exchange*, 701 P.2d 795 (Utah 1985), the Utah Supreme Court stated that a contract action could be maintained for breach of duty of good faith, in cases involving first-party insurance relationships.[2] In *Beck*, the Utah Supreme Court stated that the implied obligation of good faith requires at least "that the insurer will diligently investigate the facts to enable it to determine whether a claim is valid, will fairly evaluate the claim, and will thereafter act promptly and reasonably in rejecting or settling the claim." *Beck*, 701 P.2d at 801. The Utah Supreme Court has also recognized a tort cause of action for an insurer's breach of its duty of good faith in third-party relationships in *Ammerman v. Farmer's Insurance Exchange*, 19 Utah 2d 261, 430 P.2d 576 (1967). In *Ammerman*, the Utah Supreme Court stated that an insurance company "must act in good faith and be zealous in protecting the interests of its insured as compared to its own. Whether it discharges that duty may depend upon various considerations including the certainty or uncertainty as to the issues of liability, injuries and damages." *Ammerman*, 430 P.2d at 579.

There is no claim in this case that American failed to investigate or to evaluate Freeport's claim or that American did not act promptly in settling and rejecting Freeport's claims. The sole basis for Freeport's bad faith cause of action is that American was obligated to indemnify or defend Freeport under the policy, and that American failed to do so. American contends that a good faith dispute over the scope of coverage provided by an insurance policy, as a matter of law, will not alone support a cause of action for bad faith where the interpretation the insurer urges is neither strained nor fanciful. *See Gorman v. Southeastern Fidelity Insurance Co.*, 775 F.2d 655, 659–60 (5th Cir.1985); *Olive v. Great American Insurance Co.*, 76 N.C.App. 180, 333 S.E.2d 41 (1985); *International Indemnity Co. v. Woods*, 175 Ga.App. 490, 333 S.E.2d 640 (1985).

**2.** The *Beck* court distinguished "first-party" disputes from "third-party" disputes as follows:

We use the term "first-party" to refer to an insurance agreement where the insurer agrees to pay claims submitted to it by the insured for losses suffered by the insured. The present case involves such a first-party situa-

tion. In contrast, a "third-party," situation is one where the insurer contracts to defend the insured against claims made by third parties against the insured, and to pay any resulting liability, up to the specified dollar limit. *Beck*, 701 P.2d at 798 n. 2.

This court has previously ruled that questions of fact surround the making of the insurance contract here which prevent the court from determining the scope of coverage under the contract as a matter of law. *See Order* dated August 21, 1985. While the court does not accept plaintiff's argument that bad faith claims must be dismissed whenever a court refuses to grant summary judgment on the underlying liability issues, here the court has already determined that the scope of American's liability under the insurance policy is legitimately in dispute between the parties. Since the sole basis for plaintiff's bad faith claim has to do with the scope of liability under the policy which is in bona fide dispute, and no bad faith is asserted as to the defendant's conduct in investigating or handling Freeport's claims, the court holds that Freeport cannot maintain its cause of action for bad faith under either *Beck* or *Ammerman.* Accordingly, American's motion for summary judgment dismissing Freeport's third counterclaim in its entirety is granted. The court need not and does not reach the question of the availability of punitive damages.

### 2. *Breach of Contract Claim*

■ American also asks the court to grant summary judgment in its favor on Freeport's first counterclaim in which Freeport alleges American is in breach of contract. Specifically, Freeport alleges that coverage under policy number F–417 1170 extends to the loss of goods owned by the Pillsbury Company and that American's refusal to cover Pillsbury's loss was improper. Freeport further alleges that American's refusal to defend Freeport in litigation with Pillsbury, arising out of Pillsbury's loss, was in breach of an express and implied duty to defend under the insurance contract.

This court sees no justification for summary judgment against Freeport on this claim. The scope of coverage under the policy is disputed by the parties. The court has previously denied motions for summary judgment by both parties seeking determination of liability as a matter of law. Issues of material fact prevent declaration of the parties' rights and obligations under the contract on motion for summary judgment. Accordingly, American's motion for summary judgment on Freeport's Counterclaim for breach of contract is denied.

### 3. *Agency Issues: Broker and Agent Relationship*

Finally, American urges the court to rule that RBH was acting as Freeport's agent in all the negotiations for insurance between Freeport and American. American contends that *in obtaining insurance for American,* RBH was acting as Freeport's agent. Freeport, on the other hand, contends that RBH is and at all times was acting solely as American's agent. The parties agree that Utah law governs, but they have not cited, and this court has not found, Utah case law determining the agency of a licensed insurance broker in a transaction similar to this case. In cases where no state court has spoken a federal court must predict how the state's highest court would rule if faced with such facts. *Weiss v. United States,* 787 F.2d 518, 525 (10th Cir.1986); *Diatom v. Pennwalt,* 741 F.2d 1569, 1574–75 (10th Cir.1984). In making this prediction the policies underlying the applicable legal doctrines, the doctrinal trends indicated by these policies, and the decisions of other courts may inform a federal court's analysis. *Id.; see Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1167 (3rd Cir. 1981).

■ In the context of insurance transactions, a distinction has been made between insurance "agents" and insurance "brokers." In *Osborn v. Ozlin,* 310 U.S. 53, 60–61, 60 S.Ct. 758, 760–761, 84 L.Ed. 1074 (1939) the Supreme Court expressed the distinction as follows:

The "production" of insurance—"Production" being insurance jargon for obtaining business—is, in the main, carried on by two groups, agents and brokers. Though both are paid by commission, the different ways in which the two groups perform their functions have important practical consequences in the conduct of

the insurance business, and hence in its regulation. The agent is tied to his company. But his ability to "produce" business depends upon the confidence of the community in him. He must therefore cultivate the good will and sense of dependence of his clients. He may finance the payment of premiums; he frequently assists in the filing and prosecution of claims; he acts as mediator between insurer and assured in the diverse situations which arise. The broker, on the other hand, is an independent middleman, not tied to a particular company. He meets more specially the needs of large customers, using their concentrated bargaining power to obtain the most favorable terms from competing companies. *See also Travelers Indemnity Co. v. National Indemnity Co.*, 292 F.2d 214, 219–20 (8th Cir.1961); 16 J. Appleman & J. Appleman, Insurance Law and Practice § 8725 (1980) [hereinafter Appleman]. However, the fact that an insurance "broker" is so denominated is not conclusive in determining agency. The acts of a person, and not what he is called, determine whether he is an agent.

■ Whether a licensed insurance broker is the agent of the insurer or the insured is a troublesome area of legal doctrine. The rules that exist are riddled with exceptions. The general rule is that an insurance broker represents the insured, and not the insurer. *See, International Administrators, Inc. v. Life Insurance Co. of North America*, 553 F.Supp. 82, 85 n. 7 (N.D.Ill.1982); *Howard Fuel v. Lloyd's Underwriters*, 588 F.Supp. 1103, 1108 (S.D. N.Y.1984); 16 Appleman § 8727 at 342. However, it is also well-established that an insurance broker may represent the insurer and that the agency of a broker must be established from the facts and circumstances of each particular case. *Diplomat Homes, Inc. v. Commercial Standard Insurance Co.*, 394 F.Supp. 558, 564 (W.D. Mo.1975); *American Fire and Indemnity Co. v. Lancaster*, 286 F.Supp. 1011, 1014 (E.D.Mo.1968); *Transamerica Interway, Inc. v. Commercial Union Assurance Co.*,

97 F.R.D. 419, 421 (S.D.N.Y.1983); *see generally* 16 Appleman § 8727 at 342. It is further clear that in some circumstances a broker may be agent for both the insurer and the insured. *Diplomat Homes*, 394 F.Supp. at 564–65; *Kantoff v. Sedlak Motor Sales*, 8 Ill.App.2d 8, 130 N.E.2d 289, 290–91 (1955); 16 Appleman § 8736; Restatement (Second) of Agency § 14L (1958).

The parties agree that RBH entered into an agency agreement with American, effective January 1, 1981. However, that undisputed fact is not determinative of agency for purposes of American's motion. First, the fact that RBH may have been American's agent does not foreclose RBH from being agent for Freeport also. A person who conducts a transaction between two persons may well be the agent of both. *See* Restatement (Second) of Agency § 14L (1958). The question American presents is whether RBH acted as Freeport's agent. This question requires independent inquiry into facts regarding the relationship between RBH and Freeport. It is unclear how the relationship between RBH and Freeport was structured in general, and in particular, how the relationship between the two was structured for purposes of obtaining insurance after the Affiliated FM policy lapsed. In addition, there is a background of RBH recommending other insurance coverage to Freeport which suggests that RBH advised Freeport as to the scope of its coverage, particularly as to the goods of third persons.[3] Second, while there is some indication in the record that RBH was acting pursuant to authority given it by American, the record as a whole remains unclear. RBH did enter into an agency agreement with American, but it also entered similar agreements with some twenty-five to thirty other insurance companies. Since questions of fact remain, American's motion that the court determine that RBH was acting as Freeport's agent in negotiation for insurance with American is denied.

## B. FREEPORT'S MOTION

Freeport asks the court to grant summary judgment in its favor on both parties'

---

3. *See infra* note 14.

declaratory judgment claims, in effect declaring that any loss of the contents in Freeport's building including goods of third persons stored with Freeport, was covered under the policy, and that American has a duty under the policy to defend Freeport in claims against it for damage to goods stored at Freeport's facility. Freeport in substance renews the motion for summary judgment which the court denied on August 21, 1985. As was said at that time, material issues of fact exist. Accordingly, Freeport's motion for summary judgment is denied. In the alternative, Freeport asks the court to grant partial summary judgment ruling as a matter of law on the meaning and effect of three provisions of the insurance policy between American and Freeport.

1. *Coverage of Property of Third Parties "For Which the Insured is Legally Liable"*

    a. Scope of Coverage under the Policy as Written

█ Freeport argues that the policy language dealing with "Property Covered" plainly and unambiguously covers Freeport for the loss of Pillsbury's property, if Freeport is held legally liable for that loss.[4] In response, American agrees that the policy language is plain and unambiguous, but argues that it operates to exclude coverage for the loss claimed. Freeport urges that

the meaning of this contract should be resolved as a matter of law by the trial court on summary judgment, *Morris v. Mountain States Telephone & Telegraph Co.*, 658 P.2d 1199, 1200-01 (Utah 1983).

This court does not read Utah law, or the insurance policy, to be as plain and clear as either party would have them be. In *Morris*, the Supreme Court of Utah did say that, "whether a contract is ambiguous is a question of law which the court must decide ...," that "even the resolution of contract ambiguities is a question of law for the court," and that "the *meaning* of a contract remains a question of law, to be resolved by the court," *id.* at 1200, 1201 (emphasis added). In the more recent case of *Kimball v. Campbell*, 699 P.2d 714, 716 (Utah 1985), however, the Utah Supreme Court stated that "a contract's interpretation may be either a question of law, determined by the words of the agreement, or a question of fact, determined by extrinsic evidence of intent." Despite its statement that the meaning of contract is a question of law, the *Morris* court also acknowledged that "the process of resolving ambiguities will sometimes require the consideration of evidence, and conflict of evidence will need to be resolved by the trier of fact." 658 P.2d at 1201.[5]

The court begins with the understanding that Freeport and RBH had previously

---

**4.** The Pillsbury Company and Lloyds, London, its insurer, have filed suit against Freeport to recover the loss sustained as a result of damages to Pillsbury's frozen vegetables incurred from the collapse of Freeport's roof. *See Underwriters at Lloyds, London; and The Pillsbury Company v. Freeport Cold Storage, Inc.*, NC–84–0216G.

**5.** The Utah Supreme Court's position with respect to contract interpretation appears to have changed since *Morris*. In *Colonial Leasing Co. v. Larsen Brothers Construction*, the Utah Supreme Court stated, "Only when contract terms are complete, clear, and unambiguous can they be interpreted by the judge on a motion for summary judgment." 731 P.2d 483, 488 (Utah 1986) (citing *Morris v. Mountain States Telephone & Telegraph Co.*, 658 P.2d 1199, 1201 (Utah 1983); *see also Porter v. Grover*, 734 P.2d 464, 465 (Utah 1987)). Under Utah law, the first step in the problem before the court is in determining whether the language of the "Property Covered," provision is ambiguous. In determin-

ing a contract's ambiguity or its meaning, a court must attempt to give the contract the meaning that would be attached by a reasonably intelligent person acquainted with all the operative usages and knowing all the circumstances prior to and contemporaneous with the making of the contract. *See id.; Chicago, Rock Island & Pacific Railway Co. v. Denver & Rio Grande Railway Co.*, 143 U.S. 596, 609–10, 12 S.Ct. 479, 483–84, 36 L.Ed. 277 (1942); *Liberty National Bank & Trust Co. v. Bank of America National Trust & Savings Co.*, 218 F.2d 831, 840 (10th Cir.1955); 4 S. Williston, Williston on Contracts §§ 607 at 378–79, 629 at 919 (3rd ed. 1961); 3 A. Corbin, Corbin on Contracts §§ 542, 543 (1960). This, of course, requires that a court look to the agreement as a whole, *Utah State Medical Ass'n v. Utah State Employees Credit Union*, 655 P.2d 643, 646 (Utah 1981); *Anderson v. Gardner*, 647 P.2d 3, 4 (Utah 1982); *Land v. Land*, 605 P.2d 1248, 1251 (Utah 1980), and invariably also to the intention and understanding of the parties, 3 A. Corbin, Corbin on Contracts § 542 (1960).

dealt with each other in obtaining insurance, and that American and RBH had also previously dealt with each other. Freeport does not dispute that the phrase "or for which the insured is legally liable" is intended to provide coverage for goods of third persons on only an "incidental" basis.[6] Memorandum in Support of Defendant and Counterclaimant's Motion for Summary Judgment, at 8 ¶ 16. However, Freeport contends that since the American policy was structured to provide blanket coverage, the phrase would cover Freeport's liability for loss of property owned by a third person and stored at Freeport warehouse in an amount limited only by the maximum policy coverage amount.[7]

There is also evidence to the effect that Freeport had knowledge that without purchase of specific additional insurance in the nature of a "Warehouseman's Legal Liability policy," no such coverage of the property of third persons would exist.[8]

The language of the American policy is ambiguous. On its face, the language "or for which the insured is legally liable" seems to imply, as Freeport contends, no limitation on coverage for liability from the loss of third persons' personal property. However, in light of the background against which the contract was made, the language also seems reasonably susceptible to American's interpretation that it was intended to provide only limited, "incidental" personal property coverage. Of course, a motion for summary judgment normally may not be granted if the legal conclusion is reached that an ambiguity exists in the contract and there is a genuine issue as to some fact material to determining what the parties intended. *Colonial Leasing Co. v. Larsen Brothers Construction Co.*, 731 P.2d 483, 488 (Utah 1986);

*Faulkner v. Farnsworth*, 665 P.2d 1292, 1293 (Utah 1983); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 2513–14, 91 L.Ed.2d 202 (1986). However, this case involves an insurance policy. With respect to insurance policies, the clearly established rule in Utah is that "ambiguities are to be construed against the insurer and that words are to be given their ordinary meaning." *Fuller v. Director of Finance*, 694 P.2d 1045, 1046–47 (Utah 1985); *see Utah Farm Bureau Mutual Ins. Co. v. Orville Andrews & Sons*, Utah, 665 P.2d 1308, 1309 (1983); *Bergera v. Ideal Nat'l Life Ins. Co.*, 524 P.2d 599, 600–01 (Utah 1974); *Christensen v. Farmers Ins. Exch.*, 21 Utah 2d 194, 196–97, 443 P.2d 385, 386 (1968); *P.E. Ashton Co. v. Joyner*, 17 Utah 2d 162, 614, 406 P.2d 306, 308 (1965); *Jorgensen v. Hartford Fire Ins. Co.*, 13 Utah 2d 303, 304, 373 P.2d 580, 581 (1962). Under these rules "an insured is entitled to the broadest protection he could have reasonably understood to be provided by the policy." *Fuller*, 694 P.2d at 1047. Applying the foregoing rules to the present case, the court is constrained to hold that the language of the "Property Covered" section, would cover legal liability for a loss such as that Pillsbury sustained. However, the facts presented to the court regarding the background against which the contract was made are sufficient to present a substantial question as to whether Freeport reasonably could have understood that coverage to be available in an amount limited only by the maximum policy coverage amount. Further the court's interpretation of the contract language as it is written does not resolve all the questions prerequisite to finding American answerable for Freeport's possible lia-

---

**6.** Freeport had previously been insured against damage to its building and equipment through Affiliated FM. Under the Affiliated FM policy Freeport was insured against "legal liability for loss or damage ... to personal property belonging to others." The limit of this coverage, however, was originally $100,000. Deposition testimony indicates that such personal property coverage was considered "incidental," in a property insurance policy, and that the language in the American policy was intended to provide "incidental coverage," for instance, "employees' tools

on the premises, possibly a railroad car that might be pulled into a lumber shed that would be damaged by fire." Deposition of Charles G. Carson (Dec. 16, 1986) at 101–03.

**7.** Given the fact that Freeport's warehouse held goods of third persons valued at well in excess of three times the building's worth, this interpretation seems to strain the word "incidental."

**8.** *See infra* note 14.

bility to Lloyds and Pillsbury. Accordingly, Freeport's motion for partial summary judgment on this issue is granted.

### b. Effect of Mistake in Reducing Contract to Writing [9]

American has also asserted that even if Freeport's construction of the insurance policy prevails, American is entitled to reformation of the agreement in order to effectuate the parties' intent. American contends that a mutual mistake was made in "writing down" the parties' agreement-in-fact. Freeport responds that any mistake made was one of law and was made solely on the part of American. According to Freeport, American was simply careless in considering the bargain it was entering.

The Utah Supreme Court's most recent expression on the law of reformation and mistake is *Briggs v. Liddell*, 699 P.2d 770 (Utah 1985). In that case the court stated that a contract may be reformed for one of only two reasons:

> First, if the instrument does not embody the intentions of both parties to the contract, a mutual mistake has occurred, and reformation is appropriate. Second, if one party is laboring under a mistake about a contract term and that mistake either has been induced by the other party or is known by and conceded to by the other party, then the inequitable nature of the other party's conduct will have the same operable effect as a mistake, and reformation is permissible.

*Id.* at 772; *see Mabey v. Kay Peterson Construction Co.*, 682 P.2d 287, 291 (Utah 1984). In previous cases, the Utah Supreme Court has made clear that with respect to the first type of mistake justifying reformation, failure of the instrument to embody the intention of the parties, several types of errors may occur which would justify reformation. For instance, terms the parties intend be contained in the agreement may be inadvertently omitted.[10] Also, the parties may mistake the legal effect of the words they used to embody their intentions.[11] Reformation may be ordered in either situation under Utah law.

In this case, the court finds that several questions of fact remain which are material in determining the character of the mistake, if any, made in this case. These issues are contested, and are material to determining whether reformation should be available to American under Utah law. First, the court has already ruled that issues of fact remain regarding the agency of RBH with respect to obtaining insurance. The agency of RBH must be determined prior to any analysis of mistake in this case. Second, issues of fact remain regarding the intentions of the parties to this contract. The court has already noted that the facts before it regarding the circumstances of the creation of the contract are sufficient to render some of the contract language ambiguous at least. There is, on the whole, little direct evidence of the parties' intent currently before the court,[12] and much of the evidence relating

---

9. With respect to mistakes in the physical reduction to writing of a prior oral agreement, see Greene, *Mistake in the Utah Law of Contracts*, 7 Utah L.Rev. 304, 308–09 (1961).

10. In *Doxey–Layton Co. v. Clark*, 548 P.2d 902, 906–07 (Utah 1976) the court allowed reformation of a deed where there was clear and convincing evidence that a reservation of mineral rights was omitted from the deed through the scrivener's error.

11. For instance, in *Haslam v. Ottosen*, 689 P.2d 27 (Utah 1984) the parties entered a contract to convey real property. They intended that no mineral rights be conveyed, because the vendor did not own any, and so informed the attorney who drafted the deeds with no exception of mineral interests. Later, the vendor acquired title to a 1/11 mineral interest in the subject tract. When informed that the effect of the

deeds was to pass title to the mineral interest under Utah's after-acquired title statute the vendor sued to reform the deeds. The Utah Supreme Court stated that "it is well settled that mistakes *as to the legal effect of words used in a contract or deed*, or of the absence of them, are subject to reformation by the courts." *Id.* at 30 (emphasis added); *see also Pasotex Petroleum Co. v. Cameron*, 283 F.2d 63 (10th Cir.1960); Restatement (Second) of Contracts § 155 (1979).

12. In February of 1982, while the Affiliated policy was in place, RBH contacted Freeport informing Freeport that American would provide Freeport with broader coverage at a lesser cost than under the Affiliated policy. Specifically, RBH stated as follows:

> We suggest writing your coverage with a new carrier, as we are able to obtain broader cov-

to circumstances prior to, during and after the making of the contract is in conflict. Given the high burden American must bear in order to justify reformation, such evidence is insufficient.[13] Finally, issues of fact regarding the conduct of the parties remain. If either party can be shown to have known that the other was laboring under a mistake about a contract term and to have kept silent, reformation might be available.[14] *See Briggs*, 699 P.2d at 772; *Mabey*, 682 P.2d at 290.

None of these factual issues may be resolved on the present record before the court. Since issues of fact remain, Freeport's motion for summary judgment must be denied.

## 2. *Provision for Co–Insurance*

On this issue Freeport argues that since there is no clause titled "co-insurance" there was no co-insurance requirement under the American policy. This contention is without merit. Co-insurance clearly is mentioned in the policy, which references establish that co-insurance was intended and that some "co-insurance" requirement is applicable. The declaration page states a term of 90%, under the column entitled "Per Cent of Co–Insurance Applicable."

The lack of a definitional clause, however, is not without effects. Since there is no clause defining co-insurance the substance of the requirement, and what the term means, must be shown by extrinsic evidence which has not been presented to the court. Accordingly, Freeport's motion for partial summary judgment on this issue is denied.

## 3. *Property Excluded by Reason of "Other Insurance"*

The third provision of the policy in dispute is paragraph "C" of the Property Excluded section. It provides for exclusion from coverage under The American policy of property "covered by specific marine, inland marine, or transportation insurance." At the time of the roof collapse, Pillsbury carried insurance which covered its vegetables stored at Freeport's facility. American contends that since Pillsbury's frozen vegetables were covered by other insurance, the loss of the vegetables is excluded from coverage under its policy. Freeport asks the court to rule as a matter of law that this exclusionary provision does not apply to exclude the loss of Pillsbury's vegetables from coverage under the American policy. Freeport argues that the clause operates to exclude coverage only if Freeport is the named insured of such other insurance. American contends that the language of the provision is plain and unambiguous, and that if goods are covered under any other policy, no matter who the named insured is they are not covered un-

---

erage at a lesser cost. Writing $4,200,000 on building and equipment, together with $500,000 business interruption coverage would develop $5,640.00 annual premium. Coverage would be "all risk," excluding both flood and quake, all subject to a $5,000 deductible. Exhibit 105, Deposition of E. Arrietta (June 14, 1985). Freeport asserts it had no contact with American or RBH subsequent to this letter until the American policy was presented for acceptance.

On these facts Freeport asserts the only intention it had was to obtain broader coverage at a lesser cost. The strongest implication the court finds in the facts Freeport relates, however, is that RBH was in fact Freeport's agent. If RBH is Freeport's agent then evidence from the agent regarding intention must also be elicited.

**13.** The Utah Supreme Court has noted that "the party seeking reformation must plead the circumstances constituting mistake with particularity," and that the party seeking reformation "must establish mistake by clear and convincing proof." *Briggs*, 699 P.2d at 772.

**14.** One circumstance that is particularly telling with respect to the parties' intention in contracting for insurance is the background of RBH recommending other insurance to Freeport. From time to time, under both the Affiliated and the American policies, RBH had offered and suggested that Freeport acquire a type of coverage known as "Warehouseman's Legal Liability." This is a line of insurance separate from property insurance; it covers goods of others stored in a warehouse facility. On various occasions, RBH quoted specific rates and provided blank policy forms for Freeport's review. Freeport consistently declined to acquire this coverage. RBH and Freeport's actions regarding Warehouseman's Legal Liability are highly probative of the scope of coverage the parties intended under the American policy and of Freeport's knowledge with respect to the scope of coverage under that policy.

der the American policy. The general rule as to such "other insurance" clauses is that they are effective to exclude coverage only where two or more policies of insurance cover the same *interests*, in the same *property*, against the same *risks*, and in favor of or for the benefit of, the same *person*. *See* 6 Appleman § 3909. In this case the court sees no reason to depart from the rule. Paragraph "C" of the Property Excluded section does not exclude from coverage property covered by other insurance policies unless Freeport is the named insured of the policy. Accordingly, Freeport's motion for partial summary judgment on this issue is granted.

This Memorandum Decision and Order will suffice as the court's final action on this motion; no further Order need be prepared by counsel.